[No. H035902. Sixth Dist. Sept. 26, 2011.]

THE PEOPLE, Plaintiff and Appellant, v.
BARRY JEROME NOTTOLI, Defendant and Respondent.

[No. H035904. Sixth Dist. Sept. 26, 2011.]

THE PEOPLE, Plaintiff and Appellant, v.
REID WILLIAM NOTTOLI, Defendant and Respondent.

534

COUNSEL

Bob Lee, District Attorney, and Joyce Angell, Assistant District Attorney, for Plaintiff and Appellant.

Paul B. Meltzer and Syda Kosofsky for Defendant and Respondent Barry Jerome Nottoli and for Defendant and Respondent Reid William Nottoli.

OPINION

ELIA, J.—After granting suppression motions, a magistrate dismissed complaints against Barry Jerome Nottoli (Barry) and Reid William Nottoli (Reid), father and son.[1] The prosecution unsuccessfully brought a motion in the superior court "to compel the magistrate to reinstate the complaint[s]" pursuant to Penal Code section 871.5, subdivision (a).[2] The principal issue in these People's appeals is whether a warrantless search of Reid's vehicle and the cell phone discovered in the vehicle following a traffic stop were justified as searches incident to arrest under *Arizona v. Gant* (2009) 556 U.S. 332 [173 L.Ed.2d 485, 129 S.Ct. 1710] (*Gant*).[3]

We conclude that the suppression motions were erroneously granted.

A. *Procedural Background*

On December 24, 2010, a seven-count complaint was filed against Reid in Santa Cruz County Superior Court case No. F18672. It alleged that Reid had committed various drug and weapons offenses on or about December 16, 2009: possession of marijuana for sale (Health & Saf. Code, § 11359) (count one); cultivation of marijuana (Health & Saf. Code, § 11358) (count two); possession of a deadly weapon (Pen. Code, § 12020, subd. (a)(1)) (count three); possession of a controlled substance, specifically "Oxycontin and Morphine Sulfate" (Health & Saf. Code, § 11350, subd. (a)) (count four); possession of an assault weapon (Pen. Code, § 12280, subd. (b)) (count five);

---

[1] Because of the shared surname, we will refer to respondents by their first names.

[2] All further statutory references are to the Penal Code unless otherwise specified.

[3] After the cause was argued and submitted in case No. H035904, respondent Reid's counsel advised this court that he died on September 4, 2011, and provided this court with a certified copy of his death certificate. Although his death renders the People's appeal in case No. H035904 technically moot and requires the abatement of further proceedings (*People v. Dail* (1943) 22 Cal.2d 642, 659 [140 P.2d 828]), we exercise our inherent authority to retain the appeal for issuance of an opinion because it raises important issues of public interest that are likely to recur in other cases. (See, e.g., *In re Sheena K.* (2007) 40 Cal.4th 875, 879 [55 Cal.Rptr.3d 716, 153 P.3d 282]; *In re Jackson* (1985) 39 Cal.3d 464, 468, fn. 3 [216 Cal.Rptr. 760, 703 P.2d 100].)

possession of a blowgun (Pen. Code, § 12582) (count six); and possession of a destructive device, specifically eight incendiary projectiles (Pen. Code, § 12303) (count seven).

On January 22, 2010, a five-count complaint was filed against Barry in Santa Cruz County Superior Court case No. F18756. The complaint alleged that, on or about December 22, 2009, Barry had committed the following offenses: possession of marijuana for sale (Health & Saf. Code, § 11359) (count one); cultivation of marijuana (Health & Saf. Code, § 11358) (count two); possession of hydrocodone (Health & Saf. Code, § 11350, subd. (a)) (count three); possession of an assault weapon (Pen. Code, § 12280, subd. (b)) (count four); and possession of a deadly weapon (Pen Code, § 12020, subd. (a)(1)) (count five).

Reid filed a motion to suppress pursuant to section 1538.5 on the grounds that he had been unlawfully arrested on December 6, 2009, following a traffic stop and the ensuing warrantless searches of his vehicle and a cell phone found in the vehicle's passenger compartment violated the Fourth Amendment. He contended that the evidence seized during subsequent searches pursuant to warrants must be suppressed because the searches were based on evidence derived from unlawfully searching the cell phone. The exhibits attached to the motion indicated that, on December 8, 2009, Santa Cruz County Deputy Sheriff Steven Ryan obtained and executed a search warrant on Reid's cell phone based on the information obtained from the initial searches of the vehicle and cell phone. Deputy Ryan sought and obtained a warrant on December 9, 2009, to search 2001 Larkin Valley Road, Watsonville, and executed the search on December 16, 2009. The motion sought to suppress all evidence obtained as a result of the allegedly unlawful arrest of Reid, including urine test results, a gun found under the seat of the vehicle that Reid had been driving, the cell phone found in the vehicle, the officers' observations, Reid's statements, narcotics paraphernalia, and the evidence obtained in executing the search warrants, which included additional guns, scales, cash and drugs.

Barry joined in Reid's suppression motion, arguing that the search of Barry's home was "fruit of the poisonous tree." Barry further argued that the warrant to search his home was not supported by probable cause and was not executed in good faith since his residence was separate from Reid's residence even though both residences were situated on the same large parcel of land.

In their opposing papers, the People maintained that Deputy Ryan had probable cause to arrest Reid for being under the influence, Deputy Ryan lawfully searched the area of Reid's car where Reid was sitting incident to arrest, the vehicle was lawfully inventoried and towed for safekeeping, and

Deputy Gonzales conducted a lawful limited search of Reid's cell phone that was "substantially contemporaneous" with Reid's arrest, the search warrant for the Larkin Valley Road property was based on probable cause, and, even if Deputy Gonzales's search of Reid's cell phone was unlawful, the same evidence would have been inevitably discovered because Deputy Ryan would have obtained a search warrant to search the cell phone based on the screensaver photo that showed someone who looked like Reid brandishing two assault weapons. As to the search of Barry's residence, the People contended that the search warrant for the Larkin Valley Road property was supported by probable cause and executed in good faith.

At the time set for the preliminary hearing, the magistrate heard and granted the suppression motion. Respondents were not held to answer. The prosecutor indicated that, based on the ruling, the People did not have sufficient evidence to proceed in either case and the magistrate dismissed the complaints.

The prosecutor subsequently moved to reinstate the complaints pursuant to section 871.5. (See § 1538.5, subd. (j).)[4] The prosecutor argued, among other things, that the searches of the vehicle and cell phone were lawful as searches incident to arrest and that the magistrate erroneously denied the People's request to call Deputy Gonzales to testify at the suppression hearing. The superior court denied the motions. In each case, the People filed a notice of appeal. (See §§ 871.5, subd. (f), 1238, subd. (a)(9).)

B. *Motion to Suppress at the Preliminary Hearing*

1. *Evidence*

Deputy Sheriff Ryan attended a six-month police academy that included 40 hours of narcotics enforcement training. The deputy had investigated over 300 persons for being under the influence and arrested "a little over 80" individuals.

Deputy Ryan had worked with the county narcotics enforcement team and he had assisted the team in an "auxiliary fashion on search warrants" and with paperwork but he had never been a member of the team. He had used the team's expertise as a resource. Deputy Ryan had done some work with Deputy Yanez, a team member who had produced a manual about identifying

---

[4] Section 1538.5, subdivision (j), provides in part: "If the . . . evidence relates to a felony offense initiated by complaint and the defendant's motion for . . . suppression of the evidence at the preliminary hearing is granted, and if the defendant is not held to answer at the preliminary hearing, . . . the people may move to reinstate the complaint, or those parts of the complaint for which the defendant was not held to answer, pursuant to Section 871.5."

persons who are under the influence. Deputy Ryan recognized Deputy Yanez as an expert in the field. Deputy Ryan had learned from working with the team that drug addicts and casual drug users very often sell drugs either to maintain their habits or obtain income.

In Deputy Ryan's experience, drug paraphernalia or narcotics related to being under the influence are often found on persons under the influence, or somewhere close to them, or in their vehicles. In his experience, cell phones are the main communication device used by drug users and drug sellers. Cell phones can contain text messages related to acquiring and offering drugs. Text and voice mail messages, contact lists, call history, photos, and videos found in cell phones can be useful to investigations.

In the FTO (field training officer) training program, a trainee is paired with a more experienced deputy who teaches the trainee how to conduct a vehicle inventory in accordance with the policy of the sheriff's office and California's Vehicle Code. During Deputy Ryan's training, his FTO covered the inventory search protocol and Deputy Ryan was familiar with the policy of the sheriff's office on the subject of vehicle inventories.

At approximately 1:55 a.m. on December 6, 2009, Deputy Ryan was on duty in full uniform and traveling southbound on Highway 1 in a marked patrol car. As he was traveling at a speed of 65 miles per hour, the deputy observed a silver car, which was approximately a quarter-mile ahead, pull away from his vehicle. He accelerated to get closer and then followed approximately 100 yards behind the vehicle, keeping pace with it at 90 miles per hour for approximately a quarter of a mile. When he moved closer to the vehicle, he determined that it was a silver Acura TL.

The speed limit in that area of Highway 1 was 65 miles per hour. When the vehicle exited, Deputy Ryan followed. When the Acura made a left onto Larkin Valley Road from the off-ramp, the deputy initiated a vehicle stop by activating his overhead red stop lamp for the observed speeding in violation of Vehicle Code section 22349, subdivision (a).

Deputy Ryan contacted the driver through the front driver's window, which was rolled down, and asked for his driver's license. The driver, identified as Reid at the hearing, told the deputy that he did not have it on him. Reid said that the vehicle did not belong to him. The deputy assumed it belonged to Reid's father.

Reid appeared "very nervous" but he was "also very alert and awake" which Deputy Ryan found odd "since it was pretty late at night." Reid was not able to sit still and he was noticeably perspiring and had a "noticeable

body odor." His eyes were watery, slightly bloodshot, and darted around "in a really nervous kind of fidgeting fashion." He was rocking slightly in his seat and "seemed very, very ill at ease." His speech was rapid, "disjointed," and "very punctuated."

Reid informed Deputy Ryan that he had been up all night studying and the deputy took that fact into consideration in determining whether Reid was under the influence of a drug. Reid also said he had been drinking caffeinated energy drinks, which Deputy Ryan saw littered throughout the car. Based on his observations and training and experience, Deputy Ryan concluded that Reid was potentially under the influence of a controlled substance.

Deputy Ryan also observed that a woman slouched in the passenger seat of the vehicle was highly intoxicated. She spoke animatedly "in an exaggerated fashion" and slurred her words. Her eyes were red and watery and she informed the deputy that she had been drinking and Reid was taking her home.

Deputy Ryan walked back to his patrol vehicle and ran Reid's name for warrants and driver's license status. He learned that Reid's driver's license was expired. On the radio, Sergeant Carney, the watch commander for the night, told Deputy Ryan to call him on the cell phone. Over the cell phone, Sergeant Carney alerted Deputy Ryan that a Mr. Nottoli had been investigated for his involvement in drugs sales some years back.

The deputy returned to Reid, who said his birthday was on December 5. The deputy asked Reid to step out of the vehicle. At this point it was approximately 2:20 a.m. on December 6, 2009.

Deputy Ryan conducted a pupil check of Reid's eyes with a penlight and determined, using a pupillometer, that his pupils were constricted and fixed at approximately four millimeters, which the deputy concluded was abnormal under the ambient outdoor lighting conditions. Deputy Ryan next conducted a Romberg test, which requires the subject to estimate 30 seconds with his eyes closed and head tilted back. He observed that Reid had rapid eye tremors indicative of controlled substance use. Reid's estimate of 30 seconds was actually 25 seconds, which Deputy Ryan regarded as faster than normal. He then tested for horizontal nystagmus and found nothing significant.

Next, Deputy Ryan took Reid's pulse, which was 160 beats per minute and outside the range of normal. The deputy had tested recent users of controlled substances, who had rates of 120 to 130 beats per minute. Deputy Ryan noted that Reid's muscle tone was "very tense, very rigid," which can be attributed to nervousness or controlled substance use. He observed white spittle forming

at the corners of Reid's mouth, a symptom of dry mouth. The deputy also observed that Reid's breath was "very rapid" and "sharp."

At the end of the exam of Reid, Deputy Ryan concluded that Reid was under the influence of a stimulant based on his training and experience, the results of the exam, and Reid's excessive driving speed, which indicated to the deputy that Reid's judgment was impaired. Deputy Ryan arrested Reid for being under the influence of a controlled substance in violation of Health and Safety Code section 11550, subdivision (a), and driving on an expired license in violation of Vehicle Code section 12500, subdivision (a). He handcuffed Reid and put Reid in the back of his patrol vehicle.

Deputy Ryan could not allow the passenger to drive the vehicle, even though she was a licensed driver, because she was so intoxicated. Her emotional state had continued to deteriorate during the contact and the deputy arrested her for public intoxication.

With Reid under arrest and handcuffed in the patrol car, Deputy Ryan decided to have Reid's Acura towed. Reid had wanted Deputy Ryan to leave the Acura on the side of the road or to drive the vehicle to his house, which was a half-mile up the road. Driving the vehicle to Reid's house was not an option because the deputy was on patrol and driving it would expose the sheriff's office to liability. Deputy Ryan's decision to take the vehicle into safekeeping was based on his concern that leaving the car on the side of the road would expose it to possible vehicular theft or burglary since it was nighttime, that stretch of road was sparsely populated and not frequently traveled, and the vehicle was a nicer, newer model car.

Deputy Ryan began completing a CHP-180 form, which documents the condition and contents of a vehicle to be towed. He was acting under the authority of Vehicle Code section 22651, subdivision (h).[5]

At the hearing, Deputy Ryan acknowledged that the Santa Cruz County Sheriff's Office inventory protocol required DUI (driving under the influence) cases to be turned over to the CHP (California Highway Patrol). He explained that Reid's driving was not sufficiently impaired to require the involvement of the CHP. Reid was not arrested for DUI.

During the search of the vehicle, Deputy Ryan found a gun, with a loaded magazine and its grip facing forward so that it was easily accessible to a

---

[5] Vehicle Code section 22651, subdivision (h), provides: "A peace officer . . . may remove a vehicle located within the territorial limits in which the officer . . . may act, under the following circumstances: [¶] . . . [¶] (h)(1) When an officer arrests a person driving or in control of a vehicle for an alleged offense and the officer is, by this code or other law, required or permitted to take, and does take, the person into custody."

seated driver, underneath the driver's seat. The gun was a "Guncrafter Industries' conversion of a Glock 20 handgun," altered to "fire a very propriety [*sic*] and powerful handgun round," a .50-caliber, hollow-point round. Deputy Ryan, who was a longtime, avid gun enthusiast and collector, recognized the gun immediately. He confronted Reid, who admitted the gun was his. Although the gun itself was not an illegal weapon, it was illegal to have the gun in the car; it should have been secured in the trunk.

At some point while Deputy Ryan was conducting a search of the vehicle, Deputy Gonzales arrived and he took over the completion of the CHP-180 form. Deputy Ryan was searching the vehicle for narcotics and drug paraphernalia.

In the driver's side door cubby, Deputy Ryan located two hollow tubes, one cardboard and the other plastic, each with a white powdery residue inside. He suspected that the tubes were "tooters," straws used to ingest drugs. At some point, the deputy called dispatch and requested a canine sniffer, a drug-trained dog, to run around the car.

Deputy Ryan found a BlackBerry Curve cell phone in the vehicle's center cup holder area. The BlackBerry Curve is a smart phone capable of receiving and sending e-mail and text messages and taking and storing photographs. It also provides Internet access and is essentially a small computer. Deputy Ryan picked up the BlackBerry and "pressed a key to see if it was functional." He also thought he was going to find further evidence of drug use.

The phone's screen showed a photograph of someone wearing a mask, a white smock, and camouflage baseball cap. The person was "wielding two rifles in akimbo fashion." The hat in the photograph was "remarkably similar" to the hat that Reid was wearing when stopped that night and the person in the photograph and Reid were both "larger in stature, more full body [*sic*]." Deputy Ryan believed the individual in the photograph holding the rifles was Reid.

The deputy immediately became concerned about terrorism or violence. Based on his training and experience and the characteristics of the rifles observable in the photograph, Deputy Ryan identified them as real AR-15 style assault rifles, which are a semiautomatic version of the M16. AR-15 rifles are very difficult to obtain legally in California. When the assault weapon ban was enacted in California, there was a window period during which owners of assault weapons previously purchased legally under California law could register their weapons. Otherwise, only law enforcement and military

personnel may generally register assault weapons in California. But in Nevada, it is legal to rent and shoot fully automatic weapons. Reid denied owning any assault rifles.

Based on the cell phone's "wallpaper" photograph, Deputy Ryan believed that "the cell phone would have evidence of possibly gun-related crimes," such as discussions related to obtaining, trafficking or selling illegal weaponry. Since he knew that cell phones are a common means of communication between drug users and sellers and he had found tooters in the vehicle, he also believed that the cell phone would contain further evidence of drug use, drug transactions, and drug trafficking.

Deputy Ryan handed the cell phone to Deputy Gonzales. At that juncture, only about 10 minutes had elapsed since arresting defendant Reid and starting the search of the vehicle. Sergeant Carney arrived on scene about seven to 10 minutes after the handgun was found.

Deputy Gonzales looked through the cell phone's text messages, photographs and e-mails for about 10 minutes. Deputy Gonzales found many photographs of different firearms. At the scene, Deputy Ryan was shown five text messages, two photographs of guns, and an e-mail. The text messages related to marijuana cultivation. There was an e-mail receipt from gunbroker.net for "the purchase of incendiary projectiles for 50 BMG caliber." Incendiary projectiles contain highly flammable material that may set an object on fire upon impact. They are illegal in California.

In the probable cause form that Deputy Ryan completed at the scene, he stated that he believed Reid was potentially under the influence of a stimulant. At 3:17 a.m. on December 6, 2009, Deputy Ryan called for a tow truck. Someone from a towing company arrived and towed the Acura.

Deputy Ryan transported Reid to Dominican Hospital ER, where he obtained a urine sample from Reid. The deputy tested the sample and the result showed a "presumptive positive" for "THC usage, marijuana, and opiates." The drug test results showed that Reid was not under the influence of stimulants. In his Health and Safety Code section 11550 arrest report, which the deputy completed after the drug test, he stated that he thought that Reid had used opiates. At the suppression hearing, Deputy Ryan conceded that the standard investigation of a person suspected of being under the influence involves field tests and then a blood or a urine test.

Subsequently, Deputy Ryan sought and obtained a search warrant to search Reid's cell phone. Based upon the additional information obtained from the cell phone, a search warrant for his residence was sought.

At the suppression hearing, the magistrate decided to initially focus on the evidence relevant to the validity of the traffic stop and warrantless searches of the vehicle and cell phone and resolve those issues first.

## 2. *Ruling on Motion to Suppress*

The prosecutor contended that the traffic stop, detention, and arrest were reasonable. As to the vehicle search, she argued that Deputy Ryan was entitled, under *Gant, supra*, 556 U.S. 332 [129 S.Ct. 1710], to search Reid's car for evidence relevant to the arrest for violating Health and Safety Code section 11550. The prosecutor maintained that opening the BlackBerry cell phone was permissible under *U.S. v. Finley* (5th Cir. 2007) 477 F.3d 250.[6] Pointing to the deputy's testimony that drug purchasers commonly arrange drug buys through cell phone text messaging, the prosecutor argued that the deputies lawfully turned on and searched Reid's cell phone incident to his arrest.

The magistrate determined that Deputy Ryan's observations justified the traffic stop and Reid's detention based on the violation of the posted speed limit. He concluded that Deputy Ryan lawfully arrested Reid for violating Health and Safety Code section 11550, subdivision (a), and Vehicle Code section 12500, subdivision (a), based upon his observations and his examinations of Reid and his training and experience. He further determined that Deputy Ryan properly decided to impound the Acura since defendant Reid had an expired driver's license, Reid was under the influence of a controlled substance, the passenger was unable to drive safely, the vehicle was "fairly expensive," and the location of the stop made it a possible target of theft and vandalism. The magistrate then concluded that the reasonable impoundment justified a warrantless inventory search of the vehicle pursuant to standardized procedure. The inventory search justified the discovery of the loaded handgun, the two tooters, and the cell phone. But the magistrate concluded that the circumstances did not justify the opening and searching of the BlackBerry by the officers.

The magistrate found that the search of the BlackBerry was "an intentional act by the deputy in seeking further evidence of any crimes." He explained his grant of the motion to suppress: "I think there was an expectation of privacy that the defendant had for his Blackberry, that there were not

---

[6] In *Finley*, a pre-*Gant* case, the defendant was arrested following a controlled purchase of methamphetamine from a passenger in a van parked at a truckstop and driven by the defendant. (*U.S. v. Finley, supra*, 477 F.3d at pp. 253–254.) The United States Court of Appeals, Fifth Circuit, determined that police were entitled to search the defendant at the scene of the traffic stop, to seize a cell phone located in his pocket, and to search the cell phone, including call records and text messages. (*Id.* at pp. 259–260.)

sufficient grounds to authorize the deputy to open that Blackberry up and, therefore, anything that was discovered as a result of that activity would be suppressed . . . ." Although the magistrate stated that "[t]he cell phone had nothing to do with the crimes in [*sic*] which he was arrested," he did not state that he disbelieved Deputy Ryan's testimony regarding the use of cell phones by drug users to arrange drug buys. The magistrate concluded: "As a result of the Blackberry being opened up a search warrant was secured of the defendant's home, the four structures as indicated in that affidavit. . . . [T]hat search warrant would be invalid as a result of this Court's finding today."

The magistrate did not reach the remaining Fourth Amendment issues.

## C. *Search of Vehicle and Cell Phone*

On appeal, the People agree with the magistrate's determinations that the vehicle stop and arrest of Reid were lawful and the ensuing search of the vehicle was justified as an inventory search. They argue that the vehicle search was also lawful as a search incident to arrest because it was reasonable to believe· that narcotics and drug paraphernalia relevant to Reid's arrest for being under the influence might be found in the vehicle. The People also maintain that it was reasonable to believe that the cell phone might provide evidence of the offense of being under the influence. They urge us to find that the magistrate erred in suppressing the evidence derived from searching Reid's cell phone and the superior court erred in denying the People's motions to reinstate the complaints.

### 1. *Review of Suppression Ruling on Review of Motions to Reinstate Complaints*

"In a proceeding under Penal Code section 871.5 to reinstate a complaint, the superior court sits as a reviewing court and is bound by the magistrate's findings of fact if they are supported by substantial evidence. (*People* v. *Slaughter* (1984) 35 Cal.3d 629, 633 [200 Cal.Rptr. 448, 677 P.2d 854].)" (*People v. Rosales* (1989) 211 Cal.App.3d 325, 329 [259 Cal.Rptr. 503].) The only ground for a motion for reinstatement of a complaint is that "as a matter of law, the magistrate erroneously dismissed the action or a portion thereof." (§ 871.5, subd. (b).) "In determining whether to compel reinstatement of a complaint dismissed after the granting of a defendant's suppression motion by the magistrate at a preliminary hearing, the superior court reviews the legal soundness of the magistrate's ruling on the suppression motion [citations] based on 'the record of the proceedings before the magistrate' (§ 871.5, subd. (c))." (*People v. Toney* (2004) 32 Cal.4th 228, 233 [8 Cal.Rptr.3d 577, 82 P.3d 778].)

"On appeal from an order denying a motion to reinstate a criminal complaint under section 871.5, we disregard the superior court's ruling and

directly examine the magistrate's ruling to determine if the dismissal of the complaint was erroneous as a matter of law. To the extent the magistrate's decision rests upon factual findings, '[w]e, like the superior court, must draw every legitimate inference in favor of the magistrate's ruling and cannot substitute our judgment, on the credibility or weight of the evidence, for that of the magistrate.' [Citation.]" (*People v. Massey* (2000) 79 Cal.App.4th 204, 210 [93 Cal.Rptr.2d 890].) "We review the magistrate's legal conclusions de novo, but are bound by any factual findings the magistrate made if they are supported by substantial evidence." (*People v. Plumlee* (2008) 166 Cal.App.4th 935, 939 [83 Cal.Rptr.3d 172].)

"[I]t is the duty of the superior court, and ours as well, to measure those facts, as found by the magistrate, against the constitutional standard of reasonableness. The constitutional issue is solely a question of law and if the magistrate mistakenly concluded that a search was unconstitutional that conclusion is also erroneous 'as a matter of law.' " (*People v. Salzman* (1982) 131 Cal.App.3d 676, 684 [182 Cal.Rptr. 748].)

Respondents now argue that the magistrate's ruling was based on its "factual finding" that the deputies had "no reason to believe that the vehicle or cell phone contained evidence relevant to the crimes of arrest" and we must defer to the magistrate's "implied factual finding." We do not regard any implicit determination that it was *not reasonable* to believe that evidence of the arrest offenses might be found in the vehicle as a factual finding. The magistrate did not indicate that he disbelieved any of Deputy Ryan's testimony. (Cf. *People v. Fay* (1986) 184 Cal.App.3d 882, 890 [229 Cal.Rptr. 291] [magistrate's ruling did not "encompass anything like a finding that Inspector Hance was not a credible witness"].) While we accept the magistrate's findings of fact that are supported by substantial evidence, it is this court's responsibility to measure the facts against the Fourth Amendment standards articulated by the United States Supreme Court. (See *People v. Salzman, supra*, 131 Cal.App.3d at p. 684; cf. *People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

2. *Inventory Search*

We agree with respondents that the warrantless search of the cell phone was not shown to be valid as part of an inventory search. In *South Dakota v. Opperman* (1976) 428 U.S. 364 [49 L.Ed.2d 1000, 96 S.Ct. 3092], the Supreme Court held that "a routine inventory search of an automobile lawfully impounded by police for violations of municipal parking ordinances," consistent with "standard police procedures," was reasonable under the Fourth Amendment to the United States Constitution. (*Opperman*, at pp. 365, 372–376 [upholding search of glove compartment]; cf. *Illinois v.*

*Lafayette* (1983) 462 U.S. 640, 648 [77 L.Ed.2d 65, 103 S.Ct. 2605] [holding that "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures"].) The court has made clear that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." (*Colorado v. Bertine* (1987) 479 U.S. 367, 374 [93 L.Ed.2d 739, 107 S.Ct. 738], fn. omitted; see *id.* at p. 374, fn. 6 ["Police Department's procedures mandated the opening of closed containers and the listing of their contents."].) The Supreme Court's "view that standardized criteria [citation] or established routine [citation] must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." (*Florida v. Wells* (1990) 495 U.S. 1, 4 [109 L.Ed.2d 1, 110 S.Ct. 1632].)

While "[t]he policy or practice governing inventory searches should be designed to produce an inventory" (*Florida v. Wells, supra,* 495 U.S. at p. 4), it is a permissible policy to require all containers to be opened, to prohibit the opening of any container, or "to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors." (*Ibid.*) "The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." (*Ibid.*) But the lack of any policy governing the opening of closed containers encountered during an inventory search of a vehicle will invalidate the search of the closed container because the search is "not sufficiently regulated to satisfy the Fourth Amendment." (*Id.* at p. 5 [marijuana found in locked suitcase found in trunk properly suppressed].)

In this case, the sheriff's deputy testified, among other things, that he turned on the cell phone to determine if it was functional. But there was no evidence that this step or the subsequent search of the cell phone was taken in accordance with any standardized policy or practice governing inventory searches. Consequently, neither the viewing of the opening screen nor the subsequent search of the cell phone's contents could be considered valid as part of a lawful inventory search.

3. *Search Incident to Arrest*

a. *Legal Principles*

In *Chimel v. California* (1969) 395 U.S. 752, 762–763 [23 L.Ed.2d 685, 89 S.Ct. 2034] (*Chimel*), the Supreme Court established that, incident to a

lawful custodial arrest, the arresting officer could search the arrestee and the area within the arrestee's immediate control. The two justifications for the authority to search were officer safety and preservation of evidence. (*Id.* at p. 763; see *Knowles v. Iowa* (1998) 525 U.S. 113, 116–117 [142 L.Ed.2d 492, 119 S.Ct. 484] [There are "two historical rationales for the 'search incident to arrest' exception: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial. [Citations.]"].) The area within an arrestee's immediate control was construed to "mean the area from within which he might gain possession of a weapon or destructible evidence." (*Chimel, supra,* 395 U.S. at p. 763.)

In *United States v. Robinson* (1973) 414 U.S. 218 [38 L.Ed.2d 427, 94 S.Ct. 467] (*Robinson*), the Supreme Court held that the authority to "search as incident to an arrest was a 'bright-line rule,' which was based on the concern for officer safety and destruction or loss of evidence, but which did not depend in every case upon the existence of either concern." (*Knowles v. Iowa, supra,* 525 U.S. at p. 118.) In *Robinson,* a police officer "effected a full-custody arrest" after stopping a vehicle based upon probable cause to believe that the driver was operating a motor vehicle with a revoked operator's permit, and then searched the driver even though the officer did not suspect that the driver was armed. (*Robinson, supra,* 414 U.S. at p. 221, fn. omitted; see *id.* at pp. 220–223, 236.) The Supreme Court explained its holding: "A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment . . ." and "[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." (*Robinson, supra,* 414 U.S. at p. 235.) "[T]he absence of probable fruits or further evidence of the particular crime for which the arrest is made" did not narrow the scope of the search incident to arrest. (*Id.* at p. 234.) The court held: "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. . . . [I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." (*Id.* at p. 235.) Under these principles, the arresting officer was entitled to search the driver, examine the crumpled cigarette package found in his pocket, and to seize the heroin capsules found inside. (*Id.* at pp. 223, 236; see *Gustafson v. Florida* (1973) 414 U.S. 260, 266 [38 L.Ed.2d 456, 94 S.Ct. 488] [upon custodial arrest for driving automobile without possession of a valid operator's license, police officer was entitled to search

arrestee's person incident to arrest, inspect box of cigarettes found in the arrestee's pocket, and seize the homemade cigarettes that the officer believed contained marijuana].)

In *New York v. Belton* (1981) 453 U.S. 454 [69 L.Ed.2d 768, 101 S.Ct. 2860] (*Belton*), the Supreme Court "considered *Chimel*'s application to the automobile context." (*Gant, supra*, 556 U.S. at p. 339 [129 S.Ct. at p. 1716].) The court determined that "the area within the immediate control of the arrestee" in the vehicular context was the vehicle's passenger compartment. (*Belton, supra*, 453 U.S. at p. 460.) It stated the rule that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (*Ibid.*, fns. omitted.) It also established the corollary rule "that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach. [Citations.]" (*Id.* at pp. 460–461, fn. omitted.) The court explained that the word "container" "denote[d] any object capable of holding another object" and its "holding encompasse[d] only the interior of the passenger compartment of an automobile and [did] not encompass the trunk." (*Id.* at p. 461, fn. 4.) The court clarified that "[s]uch a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." (*Id.* at p. 461.)

*Thornton v. United States* (2004) 541 U.S. 615 [158 L.Ed.2d 905, 124 S.Ct. 2127] (*Thornton*), extended *Belton* to encompass searches incident to the arrest of persons who were recent occupants of vehicles. The Supreme Court stated: "In all relevant aspects, the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle." (*Id.* at p. 621.) It concluded that "*Belton* governs even when an officer does not make contact until the person arrested has left the vehicle."[7] (541 U.S. at p. 617.)

In *Gant, supra*, 556 U.S. 332 [129 S.Ct. 1710], a divided Supreme Court rejected a "broad reading" of *Belton*'s bright-line rule that would permit vehicular searches incident to arrest even where the arrestee was safely in custody and could not possibly retrieve weapons or evidence from his vehicle at the time of the search. (*Id.* at pp. 335, 341–347 [129 S.Ct. at pp. 1714, 1718–1721].) "To read *Belton* as authorizing a vehicle search incident to

---

[7] The Supreme Court recognized that an "arrestee's status as a 'recent occupant' may turn on his temporal or spatial relationship to the car at the time of the arrest and search . . . ." (*Thornton, supra*, 541 U.S. at p. 622, fn. omitted.)

every recent occupant's arrest would thus untether the rule from the justifications underlying the *Chimel* exception—a result clearly incompatible with our statement in *Belton* that it 'in no way alters the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to lawful custodial arrests.' 453 U.S., at 460, n. 3 [69 L.Ed.2d 768, 101 S.Ct. 2860]." (*Id.* at p. 343 [129 S.Ct. at p. 1719].) "Construing *Belton* broadly to allow vehicle searches incident to any arrest would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment . . . ." (*Id.* at p. 347 [129 S.Ct. at p. 1721].)

The court in *Gant* held that "the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." (*Gant, supra,* 556 U.S. at p. 343 [129 S.Ct. at p. 1719], fn. omitted.) It stated "[t]he safety and evidentiary justifications underlying *Chimel*'s reaching-distance rule determine *Belton*'s scope" and it made clear that "*Belton* does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." (*Id.* at p. 335 [129 S.Ct. at p. 1714].) Consequently, *Belton* did not authorize a vehicular search of Gant's car since he was handcuffed and "locked in the back of a patrol car" when "police officers searched his car and discovered cocaine in the pocket of a jacket on the backseat." (*Ibid.*)

 The Supreme Court proceeded to recognize an alternative justification permitting vehicular searches incident to arrest even if an arrestee was secured in custody: "Although it does not follow from *Chimel*, we also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' *Thornton*, 541 U.S., at 632, 124 S.Ct. 2127 (Scalia, J., concurring in judgment)." (*Gant, supra,* 556 U.S. at p. 343 [129 S.Ct. at p. 1719]; see *id.* at p. 335 [129 S.Ct. at p. 1714].) The court declared that this new rule was "[c]onsistent with the holding in *Thornton* v. *United States*, 541 U.S. 615 [158 L.Ed.2d 905, 124 S.Ct. 2127] (2004), and follow[ed] the suggestion in Justice Scalia's opinion concurring in the judgment in that case, *id.*, at 632 [124 S.Ct. 2127] . . . ." (*Id.* at p. 335 [129 S.Ct. at p. 1714].)

In his separate opinion in *Thornton*, Justice Scalia had stated: "If *Belton* searches are justifiable, it is not because the arrestee might grab a weapon or evidentiary item from his car, but simply because the car might contain evidence relevant to the crime for which he was arrested." (*Thornton, supra,* 541 U.S. at p. 629 (conc. opn. of Scalia, J.).) Justice Scalia recognized the government's general interest in gathering evidence related to the crime of

arrest and reasoned: "There is nothing irrational about broader police authority to search for evidence when and where the perpetrator of a crime is lawfully arrested. The fact of prior lawful arrest distinguishes the arrestee from society at large, and distinguishes a search for evidence of *his* crime from general rummaging. Moreover, it is not illogical to assume that evidence of a crime is most likely to be found where the suspect was apprehended." (*Id.* at p. 630 (conc. opn. of Scalia, J.).)

As to application of the newly articulated justification for a vehicular search incident to arrest, the Supreme Court in *Gant* explained: "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. See, *e.g., Atwater* v. *Lago Vista*, 532 U.S. 318, 324 [149 L.Ed.2d 549, 121 S.Ct. 1536] (2001); *Knowles* v. *Iowa*[, *supra*,] 525 U.S. 113, 118 [142 L.Ed.2d 492, 119 S.Ct. 484] . . . . But in others, including *Belton* and *Thornton*, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." (*Gant, supra*, 556 U.S. at pp. 343–344 [129 S.Ct. at p. 1719].) In the *Gant* case "[n]either the possibility of access nor the likelihood of discovering offense-related evidence authorized the search . . . ." (*Id.* at p. 344 [129 S.Ct. at p. 1719].) The offense for which Gant was arrested, driving with a suspended license, was "an offense for which police could not expect to find evidence in the passenger compartment of Gant's car. Cf. *Knowles*, 525 U.S., at 118 [119 S.Ct. 484]." (*Id.* at pp. 335, 344 [129 S.Ct. at pp. 1714, 1719].) The court concluded that "[b]ecause police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein, the search . . . was unreasonable." (*Id.* at p. 344 [129 S.Ct. at p. 1719].)

■ *Gant* made clear that when neither of the two announced justifications for a vehicular search incident to arrest is present, "a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." (*Gant, supra*, 556 U.S. at p. 351 [129 S.Ct. at pp. 1723–1724].)

b. *Search of Vehicle Driven by Respondent Reid*

In this case, the *Belton* safety and preservation of destructible evidence rationales were certainly not applicable since Reid was handcuffed and secured in a patrol car before any vehicular search occurred. As in *Gant*, there was no reasonable basis to believe that evidence, relevant to Reid's

arrest for driving with an expired license in violation of Vehicle Code section 12500, subdivision (a), might be found in the vehicle.[8]

While we recognize that *Gant* was not entirely consistent in its language, the court explicitly held that a vehicular search incident to arrest is valid when "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle" (*Gant, supra,* 556 U.S. at p. 335 [129 S.Ct. at p. 1714]) or when "it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' [Citation.]"[9] (556 U.S. at p. 343 [129 S.Ct. at p. 1719].) Thus, the threshold issue is whether it was reasonable to believe that evidence relevant to Reid's crime of arrest for being under the influence of a controlled substance in violation of Health and Safety Code section 11550, subdivision (a), *might* be found in the interior of the Acura.

In both *Belton* and *Thornton,* the crime of arrest was possession of a controlled substance. (*Belton, supra,* 453 U.S. at p. 456 [arrest for unlawful possession of marijuana]; *Thornton, supra,* 541 U.S. at p. 618 [arrest for unlawful possession of marijuana and crack cocaine].) In *Gant,* the Supreme Court recognized that the offense of arrest in *Belton* and in *Thornton* supplied "a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." (*Gant, supra,* 556 U.S. at p. 344 [129 S.Ct. at p. 1719].) The arrest offense of being under the influence in this case is likewise a drug crime.

Respondents attempt to distinguish *Belton* and *Thornton* on the ground that the police in those cases found illegal drugs before conducting the vehicle search incident to arrest. Citing two federal district court cases, respondents maintain that it was not reasonable to believe the vehicle might contain evidence relevant to being under the influence of a controlled substance.

In *U.S. v. Reagan* (2010) 713 F.Supp.2d 724, a court concluded that a national park ranger's warrantless search of a vehicle incident to the arrest of

---

[8] Vehicle Code section 12500, subdivision (a), provides: "A person may not drive a motor vehicle upon a highway, unless the person then holds a valid driver's license issued under this code, except those persons who are expressly exempted under this code." (See Pen. Code, § 19.8 [violation of Veh. Code, § 12500 is an infraction].)

[9] There is no basis in *Gant* to conclude that the court was imposing a test equivalent to and duplicative of the automobile exception's probable cause standard. The majority opinion in *Gant* distinguished the automobile exception (*Gant, supra,* 556 U.S. at pp. 346–347 [129 S.Ct. at p. 1721]) and Justice Alito asked in his dissent, "Why, for example, is the standard for this type of evidence-gathering search 'reason to believe' rather than probable cause?" (*Id.* at p. 364 [129 S.Ct. at p. 1731] (dis. opn. of Alito, J.).) "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' *Illinois v. Gates,* 462 U.S. 213, 238 [76 L.Ed.2d 527, 103 S.Ct. 2317] (1983)." (*United States v. Grubbs* (2006) 547 U.S. 90, 95 [164 L.Ed.2d 195, 126 S.Ct. 1494].) *Gant* does not impose such a standard.

the driver for DUI was unlawful. (*Id.* at p. 734.) The court found that it was "not reasonable to believe that evidence of DUI is inside the passenger compartment of a vehicle based solely upon the nature of the charge or the existence of evidence that the vehicle's driver is intoxicated." (*Id.* at p. 733.) It gave examples of particular facts that could give rise to "a particularized and articulable reason to believe" that the passenger compartment of a vehicle contains evidence of a DUI offense: "observations of the driver drinking while driving, observations of an open container of alcohol in plain view inside the passenger compartment, statements made by the occupants of the vehicle indicating that an open container is in the passenger compartment, the smell of alcohol emanating from within the passenger compartment, or indications that the driver was traveling from a location such as a recreational area or campground where alcohol is not available unless it is transported in by private vehicle." (*Id.* at p. 733 & fn. 7.) Even though the ranger testified that he "sometimes discovered open containers of alcohol when searching some vehicles following the arrest of their drivers for DUI," this reason was not "particularized to the Defendant or the circumstances of this case" and the ranger's "general prior experience alone was not enough to establish a reasonable belief that evidence of DUI was contained within the Defendant's vehicle." (*Id.* at pp. 733–734.) The court acknowledged, however, that other courts had "indicated that DUI is an offense that, by its very nature, might yield physical evidence." (*Id.* at p. 732, fn. omitted.)

In *U.S. v. Grote* (2009) 629 F.Supp.2d 1201, the court determined that it was reasonable to believe that evidence relevant to the crime of arrest, DUI, might be found in the driver's vehicle where an officer, during the initial contact with the arrestee, observed, from outside the vehicle, "a brown paper bag wrapped around a bottle" located next to the driver. (*Id.* at pp. 1203–1204.) The bottle "appeared to be a bottle of alcohol since liquor stores typically put such bottles in brown paper bags." (*Id.* at p. 1204, fn. omitted.) The subsequent search of the vehicle revealed that the bag contained "a full, unopened bottle of vodka" and uncovered "a loaded handgun and some blasting caps." (*Ibid.*)

The court expressed its hesitation "to hold that a lawful arrest for DUI will always justify a search of a vehicle incident to arrest on the assumption it will always be reasonable to believe that evidence of DUI will be found in the vehicle" (*U.S. v. Grote, supra,* 629 F.Supp.2d at p. 1204). It concluded that, under the particular factual circumstances of the case, the search of the vehicle was a valid warrantless search incident to a lawful arrest under *Gant*. (*Id.* at pp. 1205–1206.) The court recognized, however, that an open bottle of vodka can be "potential corroborative evidence of DUI," "potentially corroborates that an individual was operating a motor vehicle in an intoxicated physical condition," and "arguably" constitutes "evidence of recent alcohol consumption." (*Id.* at p. 1205.)

Although these federal district courts were focused on the particularized facts, nothing in *Gant* suggests that the Supreme Court was adopting a fact-intensive test similar to the reasonable suspicion standard established by *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], in which the court stated: "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[10] (*Terry*, at p. 21.) The Supreme Court in *Gant* indicated that the nature of the crime of arrest was determinative and, in some cases, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein" while, in other cases, the offense of arrest would not provide any "reasonable basis to believe the vehicle contains relevant evidence. [Citations.]" (*Gant, supra,* 556 U.S. at pp. 343–344 [129 S.Ct. at p. 1719].) *Gant* requires reasonable possibility, not probability.

■ In this case, Reid's arrest for "being under the influence of a controlled substance" supplied a reasonable basis for believing that evidence "relevant" to that type of offense might be in his vehicle. (See *State v. Cantrell* (2010) 149 Idaho 247 [233 P.3d 178, 184] [arrest for DUI supplied basis for search of passenger compartment of an arrestee's vehicle and containers therein because DUI is an offense for which police could expect to find evidence in the vehicle's passenger compartment]; *U.S. v. Oliva* (S.D.Tex., July 1, 2009, No. C.R. No. C-09-341) 2009 WL 1918458, pp. *1, *6 [once defendant was arrested for DWI (driving while intoxicated), it was "reasonable for officers to search the vehicle for evidence of driving while intoxicated, including open or empty containers"]; see also *Brown v. State* (Fla.Dist.Ct.App. 2009) 24 So.3d 671, 678 ["the 'nature of the charge' [for which a motorist is arrested] is determinative of whether there exists a reasonable basis to search for evidence [in the vehicle incident to arrest], not whether there is some independent evidence that gives rise to a belief that the particular vehicle contains evidence"]; *Brown,* at p. 677 ["offense of arrest was theft, an offense for which police could 'expect to find evidence' " in the vehicle].)

■ Evidence need not directly prove an element of an offense to be relevant evidence. (See Evid. Code, § 210 [" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed

---

[10] *Terry* itself recognized the "distinction in purpose, character, and extent between a search incident to an arrest and a limited search for weapons" (*Terry v. Ohio, supra,* 392 U.S. at p. 25) and stated that "[a]n arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons, and the interests each is designed to serve are likewise quite different" (*id.* at p. 26). In *Robinson,* the court declared that the *Terry* decision "affords no basis to carry over to a probable-cause arrest the limitations this Court placed on a stop-and-frisk search permissible without probable cause." (*Robinson, supra,* 414 U.S. at p. 228.)

fact that is of consequence to the determination of the action."]; see also Evid. Code, §§ 140 [defining "evidence"], 410 [defining "direct evidence"], 600, subd. (b) [defining "inference"]; cf. Fed. Rules Evid., rule 401, 28 U.S.C. [" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."].)

█ When a driver is arrested for being under the influence of a controlled substance, the officers could reasonably believe that evidence relevant to that offense might be found in the vehicle. The presence of some amount of the controlled substance or drug paraphernalia in the interior of the vehicle would be circumstantial evidence tending to corroborate that a driver was in fact under the influence of the controlled substance.[11]

We conclude that the search of the Acura incident to Reid's arrest for being under the influence was lawful under *Gant* based on the nature of that offense. The government was not limited to obtaining a blood or urine sample from Reid to corroborate the officer's observations as respondents suggest.

### c. *Search of the Cell Phone*

The People argue that, since Reid was under lawful arrest for a drug-related crime, *Gant* authorized a search of the Acura's passenger compartment and any containers therein. They also assert that "[a] cellular phone is a container which might hold relevant evidence of drug-related activity." They point to Deputy Ryan's general testimony regarding drug users' use of cell phones and contend that the deputy "had sufficient reason to believe that [Reid's] cellular phone might provide evidence of the offense for which he had been arrested." Respondents counter that, even if the vehicle search was

---

[11] A number of pre-Proposition 8 cases decided by the California Supreme Court indicated that it was reasonable to search a vehicle incident to the arrest of an occupant for driving or being under the influence. (See *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 202, fn. 12 [101 Cal.Rptr. 837, 496 P.2d 1205] [pre-*Belton* case noting that, when a motorist is arrested for driving under the influence of alcohol or other drug, it is reasonable to search the vehicle for such substances incident to arrest]; *People v. Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 813, fn. 2 [91 Cal.Rptr. 729, 478 P.2d 449] [pre-*Belton* case observing that, when motorist is arrested for driving under the influence of alcohol or a narcotic, "the presence of the latter substances in the vehicle is admissible as corroborating evidence of these crimes, and a reasonable search therefor may be conducted in the interior of the vehicle in which such an offender is apprehended, as an incident to that arrest"]; *People v. Robinson* (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834] [pre-*Chimel* case concluding that since police officers lawfully arrested driver and passenger who were intoxicated, they "could lawfully examine the interior of the car for the possible presence of liquor containers"]; see also Cal. Const., art. I, § 28, former subd. (d) [now subd. (f)(2)] ["Right to Truth-in-Evidence" provision]; *In re Lance W.* (1985) 37 Cal.3d 873, 887–890 [210 Cal.Rptr. 631, 694 P.2d 744] [under "Right to Truth-in-Evidence" provision, relevant evidence obtained in violation of defendant's rights against unreasonable searches and seizures may be excluded only as required under the 4th Amend.].)

justified as a search incident to arrest, search of the cell phone was not justified because "the cell phone was neither an item immediately associated with the person of the arrestee (*People v. Diaz* [(2011)] 51 Cal.4th [84,] 93 [119 Cal.Rptr.3d 105, 244 P.3d 501]) nor a container that was likely to contain evidence of the offense of arrest (*Arizona v. Gant, supra*, 129 S.Ct. at p. 1719)."

We must immediately dispel any misconception that *Gant* limits the scope of a vehicular search incident to arrest in the situation where "it is reasonable to believe that evidence of the offense of arrest *might* be found in the vehicle." (*Gant, supra*, 556 U.S. at p. 335 [129 S.Ct. at p. 1714], italics added; see *id.* at pp. 343–344 [129 S.Ct. at p. 1719].) A close reading of *Gant* makes clear that warrantless vehicular searches are authorized in only two situations but, if authorized, the scope of vehicular searches incident to arrest as established by *Belton* is unchanged.

■ After *Gant*, the fact that a recent occupant or occupant of a vehicle is arrested is not a sufficient basis for searching the vehicle incident to that arrest. *Gant* establishes the additional precondition that either (1) the arrestee is unsecured and within reaching distance of the vehicle or (2) there is a reasonable basis for believing the vehicle might contain evidence relevant to the offense of arrest. (*Gant, supra*, 556 U.S. at pp. 335, 343, 346–347 [129 S.Ct. at pp. 1714, 1719, 1721].) In either of these situations, *Gant* provides the generalized authority to search the entire passenger compartment of a vehicle and any containers therein incident to arrest. (See *id.* at p. 344 [129 S.Ct. at p. 1719].) *Gant* implicitly determined that these requirements were sufficient to ensure that vehicular searches incident to arrest were tethered to legitimate governmental interests related to arrest and adequately addressed "the central concern underlying the Fourth Amendment" that police officers not have "unbridled discretion to rummage at will among a person's private effects." (*Gant, supra*, 556 U.S. at p. 345 [129 S.Ct. at p. 1720].) Consequently, having determined that a vehicular search incident to arrest was justified because evidence relevant to the offense of being under the influence might be found in Reid's vehicle, the deputies were justified in searching the vehicle's passenger compartment and "any containers therein." (*Gant, supra*, 556 U.S. at pp. 343–344 [129 S.Ct. at p. 1719].)

Although respondents acknowledge that *Gant* indicated "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and *any containers* therein" in drug offense cases (*Gant, supra*, 556 U.S. at p. 344 [129 S.Ct. at p. 1719], italics added), they argue that "in order to retain the integrity of the *Gant* rationale, the police may

search only any container that is reasonably likely to contain relevant evidence of the offense." They contend that, otherwise, a search of a container would be inconsistent with *Gant*'s reasoning.

We reject respondents' assertion that there must be specific, articulable facts "indicating that the cell phone held relevant evidence of the offenses for which Reid Nottoli was arrested." Respondents cannot point to any language in *Gant* imposing such a requirement. Under *Gant*, a vehicular search incident to arrest is justified "when it is reasonable to believe that evidence of the offense of arrest might be found in the *vehicle*." (*Gant, supra*, 556 U.S. at p. 335 [129 S.Ct. at p. 1714], italics added.) It does not require any degree of probability that evidence bearing on that offense will be found in a particular container that is searched.

In both *Robinson* and *Belton*, the Supreme Court made clear that the authority to search incident to a lawful custodial arrest, while based on the need to disarm and preserve evidence, did not depend on the probability that weapons or evidence would actually be found. (*Robinson, supra*, 414 U.S. at pp. 234–235; *Belton, supra*, 453 U.S. at pp. 460–461.) In *Robinson*, the offense of arrest was driving with a revoked permit (*Robinson supra*, 414 U.S. at p. 220) and there was no reason to believe that evidence relevant to that offense would be found in the crumpled cigarette package found on the arrestee. In *Belton*, the Supreme Court recognized that it was true that "containers will sometimes be such that they could hold neither a weapon nor evidence of the criminal conduct for which the suspect was arrested." (*Belton, supra*, 453 U.S. at p. 461.) In *Gant*, the Supreme Court was cognizant that *Belton* "authorize[d] police officers to search not just the passenger compartment but every purse, briefcase, or other container within that space" (*Gant, supra*, 556 U.S. at p. 345 [129 S.Ct. at p. 1720]; see *Belton, supra*, 453 U.S. at pp. 460–461). *Gant* certainly did not create different rules governing the scope of vehicular searches incident to arrest, the application of which depended upon the underlying justification in each particular case. Neither did *Gant* suggest that different rules applied to searches of containers, which turned upon whether a person or a vehicle was being searched incident to arrest.

We find no support for respondents' assertion that *Gant* narrowed the scope of vehicular searches incident to arrest, under the "evidence relevant to the crime of arrest" justification, to those "places and containers that 'may conceal the object of the search.' (*United States v. Ross* [(1982)] 456 U.S. [798,] 825 [72 L.Ed.2d 572, 102 S.Ct. 2157].)" Respondents point to *Gant*'s

statement that *"Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader" than a vehicle search incident to arrest. (*Gant, supra,* 556 U.S. at p. 347 [129 S.Ct. at p. 1721].) The "broader" scope of a vehicle search pursuant to the automobile exception refers to the fact, mentioned in the previous sentence, that *Ross* "authorizes a search of *any area of the vehicle* in which the evidence might be found." (*Ibid.,* italics added.) *Belton,* on the other hand, authorizes only a search of a vehicle's *passenger compartment* incident to arrest. (*Belton, supra,* 453 U.S. at p. 460.) This limitation is impliedly continued by *Gant.* (See *Gant, supra,* 556 U.S. at p. 344 [129 S.Ct. at p. 1719] [in certain cases, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein"].) *Gant* did not adopt a narrower but duplicative version of the automobile exception. While *Gant* rejected an overly broad reading of *Belton,* it did not turn 180 degrees away from the "bright-line" rule of *Belton* and compel a finely tuned, fact-intensive assessment with respect to every container.

Moreover, even if *Gant* were construed to require a factual predicate for searching each object found in a vehicle searched incident to arrest, a proposition we reject, it was reasonable for Deputy Ryan to believe, based on the objective circumstances and his training and experience, that evidence relevant to Reid's offense of arrest for being under the influence *might* be found on Reid's cell phone. The deputy testified that, in his experience, drug users and sellers use cell phones as their "main communication" and cell phones can contain text messages related to acquiring and offering drugs.[12] Further, as suggested by the People, text messages saved in Reid's cell phone might have identified the controlled substance or contained his admissions "as to what he had done that night." This would be corroborative evidence.

In ruling on the suppression motion, the magistrate erroneously focused on the deputy's subjective intentions to search for evidence of any crimes and Reid's expectation of privacy in his BlackBerry. Neither determines the applicability or scope of the warrant exception for vehicular searches incident to arrest.

Even if Deputies Ryan and Gonzales were searching for evidence of any crime in the vehicle and cell phone, their subjective intentions or motives did not invalidate actions that were objectively justifiable under the Fourth Amendment. (*Whren v. United States* (1996) 517 U.S. 806, 812, 813

---

[12] The magistrate commented that "[t]he cell had nothing to do with the crimes in which [Reid] was arrested" and respondents insist that this is a factual finding that must be upheld. The magistrate's remark is most reasonably understood as an observation that the cell phone was not an instrumentality or fruit of those crimes. We are not bound, of course, by the magistrate's legal determinations.

[135 L.Ed.2d 89, 116 S.Ct. 1769] ["Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."].) "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' *Scott* v. *United States*, 436 U.S. 128, 138 [56 L.Ed.2d 168, 98 S.Ct. 1717] (1978) (emphasis added). The officer's subjective motivation is irrelevant. [Citations.]" (*Brigham City v. Stuart* (2006) 547 U.S. 398, 404 [164 L.Ed.2d 650, 126 S.Ct. 1943] [regardless of police officers' subjective motives, circumstances justified warrantless entry of home under exigent circumstances exception to warrant requirement].)

■ In addition, even though a motorist's privacy interest in his vehicle was one of the Supreme Court's considerations in rejecting an overly broad reading of *Belton* (see *Gant*, 556 U.S. at pp. 344–345 [129 S.Ct. at p. 1720]), nothing in *Gant* suggests that an arrestee's privacy expectations in particular objects affect the scope of vehicular searches incident to the arrest. As stated in *Belton*, "the justification for the search [(incident to arrest)] is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." (*Belton, supra*, 453 U.S. at p. 461.) The California Supreme Court recently observed in *People v. Diaz, supra*, 51 Cal.4th 84 (*Diaz*) that *Gant* "reaffirmed *Belton*'s holding that whether a particular container may be searched does not depend on its character or the extent of the arrestee's expectation of privacy in it. (*Gant*, 556 U.S. at pp. 344–345 [129 S.Ct. at p. 1720] [in permissible warrantless search, police may search 'every purse, briefcase, or other container within' the car's passenger compartment].)" (*Diaz, supra*, 51 Cal.4th at p. 96, fn. 9.)

■ Respondents assert that "the issue of whether a cell phone should be distinguished from traditional containers due to its capacity for storage of digital information is not yet settled" and that a cell phone is not a container within the meaning of the United States Supreme Court's decisions. In *Diaz*, the California Supreme Court rejected the arguments that the nature or character of a cell phone, its capacity for storing personal data, or the arrestee's expectation of privacy in its contents required courts to treat the arrestee's cell phone found on him differently from other types of personal effects or containers that may be validly searched incident to arrest. (See *Diaz, supra*, 51 Cal.4th at pp. 94–101.) We discern no principled reason to distinguish between a cell phone found on an arrestee's person during a search incident to arrest and a cell phone found in a passenger compartment during a vehicular search incident to arrest. Respondents acknowledge that this court is bound by *Diaz*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) They explain their reasons for believing *Diaz* was wrongly decided in order to preserve the issue for further review.

The People also argue that a cell phone is a special case. The People contend that the information held in cell phones is transient and the warrantless search of the cell phone was justified by the government's interest in preserving evidence. Under *Gant*, the transitory nature of the contents of a cell phone found in a vehicle does not provide any additional authority to search a cell phone found in a vehicle. The recognized governmental interest in preserving destructible evidence at the time of arrest relates only to the protection of evidence from an arrestee who might otherwise conceal or destroy such evidence. (See *Gant, supra*, 556 U.S. at pp. 338–339 [129 S.Ct. at p. 1716].) *Gant* expressly concluded that this interest is inapplicable when an arrestee cannot possibly access the vehicle. (*Id.* at pp. 341–344 [129 S.Ct. at pp. 1718–1719].)

In sum, it is our conclusion that, after Reid was arrested for being under the influence, it was reasonable to believe that evidence relevant to that offense might be found in his vehicle. Consequently, the deputies had unqualified authority under *Gant* to search the passenger compartment of the vehicle and any container found therein (*Gant, supra*, 556 U.S. at pp. 343–344 [129 S.Ct. at p. 1719]), including Reid's cell phone. It is up to the United States Supreme Court to impose any greater limits on officers' authority to search incident to arrest. (See *Oregon v. Hass* (1975) 420 U.S. 714, 719 [43 L.Ed.2d 570, 95 S.Ct. 1215] [a state court may not impose "greater restrictions as a matter of federal constitutional law when [the United States Supreme Court] specifically refrains from imposing them" (italics omitted)]; *People v. Fletcher* (1996) 13 Cal.4th 451, 469, fn. 6 [53 Cal.Rptr.2d 572, 917 P.2d 187] [U.S. Supreme Court's "decisions on questions of federal constitutional law are binding on all state courts under the supremacy clause of the United States Constitution"]; *People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129] [state courts are "bound by decisions of the United States Supreme Court interpreting the federal Constitution [citations]"].)

4. *Attempt to Call Deputy Gonzales as a Witness*

At the end of the suppression hearing, the prosecutor attempted to call Deputy Gonzales to the stand to testify since he was the person who had searched Reid's cell phone and could actually answer questions regarding the extent and duration of that search. After the court indicated those facts were not at issue, the prosecutor asked if she could excuse the witness. On appeal, the People now argue that, *if* "the scope of the deputy's intrusion into the cellular phone's contents is found relevant and material to the legality of the phone's search, . . . the magistrate erred in precluding the People from presenting [his] testimony . . . ." Since the scope or duration of Deputy Gonzales's search of the cell phone's contents is not relevant to our analysis, we need not address this contention.

### 5. *Standing and Reasonable Expectation of Privacy*

The People argue that, to assert the fruit-of-the-poisonous-tree doctrine based upon the initial search of respondent Reid's cell phone, respondent Barry "needed to show that he had a personal and reasonable expectation of privacy in the contents of the phone." (See *Wong Sun v. United States* (1963) 371 U.S. 471, 492 [9 L.Ed.2d 441, 83 S.Ct. 407] ["seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object . . ."].) They also assert that respondent Barry "failed to present sufficient proof to meet his burden of establishing standing to object to the cellular phone search."

The People initially contended that, "[a]lthough [they] have found no California case authority directly on point, . . . a defendant's burden of proving a personal, reasonable expectation of privacy in the place searched cannot be waived by the People's silence." In their reply brief, they concede that respondents found several cases indicating that standing issues are forfeited if not timely raised in the suppression motion, which they admittedly did not do. The first time that the People raised Barry's standing to challenge the search of his son Reid's cell phone was in their written argument in support of their motion to reinstate the complaint in case No. F18756.

To claim the protection of the Fourth Amendment, a defendant must ordinarily demonstrate a legitimate expectation of privacy in the place searched. (See *Rakas v. Illinois* (1978) 439 U.S. 128, 131, fn. 1, 139–140 [58 L.Ed.2d 387, 99 S.Ct. 421]; *Rawlings v. Kentucky* (1980) 448 U.S. 98, 106 [65 L.Ed.2d 633, 100 S.Ct. 2556] [after *Rakas*, the standing question and inquiry whether there was a reasonable expectation of privacy "merge into one: whether governmental officials violated any legitimate expectation of privacy held by [the party bringing the suppression motion]"].)[13] Under

---

[13] In *Rakas v. Illinois, supra*, 439 U.S. 128, the United States Supreme Court abolished the preliminary inquiry into a defendant's "standing" to bring a suppression motion and concluded that "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." (*Id.* at p. 139; see *id.* at p. 140 [the question whether a proponent of a motion to suppress is entitled to contest the legality of a search and seizure is more properly analyzed "under the heading of substantive Fourth Amendment doctrine than under the heading of standing"].) The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place . . . [citations]." (*Id.* at p. 143; see *id.* at p. 148 [passengers failed to show they had legitimate expectation of privacy in vehicle's glove compartment or area under the seat].) The court clarified that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. [Citations.]" (*Id.* at p. 131, fn. 1.) Thus, "in order to claim the protection of the Fourth

California law, however, the People generally may not raise on appeal a new theory that was not raised at the original suppression hearing.[14] (See *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640–641 [108 Cal.Rptr. 585, 511 P.2d 33].) "To allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility of evidence is initially raised. [Fn. omitted.] [Citations.]" (*Ibid.*) This rule applies to the People's assertion that a defendant lacked any expectation of privacy in the place searched. (See *Rodriguez v. Superior Court* (1988) 199 Cal.App.3d 1453, 1462 [245 Cal.Rptr. 617] ["Having failed at the suppression hearing to assert that [defendant] lacked a reasonable expectation of privacy in the searched home, the People are now precluded from raising the issue."]; cf. *Steagald v. United States* (1981) 451 U.S. 204, 209, 211 [68 L.Ed.2d 38, 101 S.Ct. 1642] ["Government, through its assertions, concessions, and acquiescence, has lost its right to challenge petitioner's assertion that he possessed a legitimate expectation of privacy in the searched home."].) Since the prosecutor failed, in opposing the suppression motion, to assert that Barry had no reasonable expectation of privacy in the vehicle or cell phone, the People have forfeited that issue on review of the suppression ruling.

This conclusion, however, does not affect our determination that the search of the cell phone incident to arrest was lawful.

## DISPOSITION

In case No. H035902, the order denying the People's motion under section 871.5 to reinstate the complaint is reversed. Upon remand, the superior court shall return the case to the magistrate with directions to resume proceedings pursuant to section 871.5, subdivision (e).

---

Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . . [Citations.]" (*Minnesota v. Carter* (1998) 525 U.S. 83, 88 [142 L.Ed.2d 373, 119 S.Ct. 469] [since respondents had no legitimate expectation of privacy in an apartment, the Supreme Court did not need to decide whether the police officer's observation of drug packaging activities, which he saw inside the apartment through a gap in a window's closed blind, constituted a "search"].)

[14] To *affirm* a trial court's suppression ruling, however, reviewing courts may rely on a new theory that was not raised below "[w]hen . . . the record fully establishes another basis for affirming the trial court's ruling and there does not appear to be any further evidence that could have been introduced to defeat the theory." (*Green v. Superior Court* (1985) 40 Cal.3d 126, 138–139 [219 Cal.Rptr. 186, 707 P.2d 248], fn. omitted.)

In case No. H035904, all proceedings are permanently abated as to Reid Nottoli by reason of his death and the superior court is directed to enter an order to that effect in case No. F18672.

Premo, Acting P. J., and Lucas, J.,[*] concurred.

---

[*]Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.