UNITED STATES of America,
Plaintiff–Appellee,

v.

Patricia Elaine HULSEY,
Defendant–Appellant.

No. 00–2987.

United States Court of Appeals,
Seventh Circuit.

Argued March 6, 2001.

Decided April 11, 2001.

Rehearing and Suggestion for Rehearing en Banc Denied May 17, 2001.

Before FAIRCHILD, CUDAHY, RIPPLE, Circuit Judges.

## ORDER

Based on tips and other information, local police officers suspected Patricia Hulsey possessed controlled substances in her car. To protect the identity of one of their sources, the officers did not pull Hulsey over until she violated a traffic ordinance. A subsequent search uncovered illegal drugs. Hulsey conditionally pleaded guilty to possessing methamphetamine

with the intent to distribute that substance, 18 U.S.C. § 841(a)(1), reserving her right to appeal the district court's denial of her suppression motion. On appeal, she argues that the officers lacked probable cause to stop and search her vehicle. We affirm.

## BACKGROUND

Russell Cragin, a Dunn County, Wisconsin, sheriff's sergeant assigned to the West Central Drug Task Force, first suspected Hulsey's involvement with methamphetamine and marijuana when he discovered her name along with numbers he interpreted to be prices and amounts of those drugs in a notebook owned by Scott Fedderly, an individual who eventually pleaded guilty to federal drug charges. When Hulsey refused to answer Sergeant Cragin's questions about Fedderly, Cragin did not investigate the matter further.

Approximately a year and a half later, during the summer and fall of 1999, Sergeant Cragin again became suspicious of Hulsey. During that period, he received "numerous reports" that she regularly sold marijuana and methamphetamine from her place of employment, a bar named the Elk Point Tavern. At the suppression hearing, Cragin elaborated on only one of the tips he received during this time period. He testified that an informant, referred to as "CI-1," told him that her friend made weekly purchases of methamphetamine from Hulsey at the tavern. The informant agreed to attempt to make a controlled purchase of drugs from Hulsey. When CI-1 arrived at the tavern, however, Hulsey was not there. The police did not attempt another controlled purchase.

On November 28, 1999, another informant, "CI-2," told Cragin that a woman disclosed to him that Hulsey planned to drive the next day to the Minneapolis/St. Paul area to pick up methamphetamine and marijuana. CI-2, who had previously supplied accurate information, also stated that he declined this woman's request for help in stealing the drugs from Hulsey's car. Sergeant Cragin did not attempt to verify this information.

The next day, Sergeant Cragin returned a phone call from Hulsey's daughter, Tonya. Without revealing the source of her knowledge, Tonya stated that her mother was planning to drive that same day to the Twin Cities to pick up methamphetamine and marijuana. During their telephone conversation, Tonya described her mother's car as a maroon Oldsmobile Toronado with Minnesota plates. Cragin testified that Tonya sounded upset as she related her frustration over her mother's drug use. She asked Cragin if he would confiscate her mother's drugs, adding that the drugs would probably be in her mother's home or in the trunk of her mother's car. Tonya told Cragin that she had not seen the drugs herself and refused his request that she attempt to purchase drugs from her mother. Tonya asked Sergeant Cragin not to reveal her participation in the investigation.

After speaking with Tonya, Sergeant Cragin decided to go to Hulsey's home to investigate. On the way, he received another message to call Tonya. When he called her, Tonya told Cragin that she had just spoken with somebody at the Elk Point Tavern who informed her that her mother was at work and had just finished packaging the drugs. Based on this information, Sergeant Cragin drove to the Elk Point Tavern, requesting Officer Bradley Leach and Sergeant Todd Kurtzhals to meet him there.

Upon arriving at the tavern, Sergeant Cragin observed Hulsey briefly stand next to her car in the parking lot and then enter the bar. In an attempt to conceal Tonya's participation, the officers decided that they would stop Hulsey for a traffic

violation. Consistent with this plan, Officer Leach followed Hulsey after she drove away from the bar.

After observing Hulsey's vehicle twice cross the center-line, Officer Leach pulled her over. Sergeant Kurtzhals soon appeared on the scene to assist with the traffic stop. Upon detecting the smell of alcohol, Leach asked Hulsey if she had anything to drink that evening. Hulsey responded that she had consumed four beers, the last less than ten minutes ago. Leach then ordered her to exit the car for a field sobriety test. Kurtzhals, who also detected alcohol on Hulsey's breath, asked her whether there were any open containers of alcohol in the car. When she indicated that there might be some left over from deer hunting season, Kurtzhals requested permission to search for open containers. Hulsey consented. During the search, Hulsey passed the field sobriety test and gave a breath sample that was within the legal limit for blood alcohol content while driving.

Sergeant Kurtzhals's search first uncovered an open cold beer between the front seats. He then picked up Hulsey's wallet which was also between the seats. Flipping open the wallet, Kurtzhals observed the edge of a clear plastic bag sticking out of one of the wallet's interior compartments. At this point, Hulsey objected to the search stating that the officer "didn't ask for permission to look through my wallet." Kurtzhals removed the bag and observed two glass vials containing powdery substances which he believed to be either cocaine or methamphetamine. He arrested Hulsey for the possession of a controlled substance. A pat-down search of Hulsey revealed more methamphetamine in her pants pocket. Officer Leach handcuffed Hulsey, placed her in his car, read her the Miranda warnings, and transported her to the Dunn County Jail. Kurtzhals, with the help of Sergeant Cragin

and Investigator Steven Cronis, continued to search the car. They found $1500.00 in Hulsey's wallet and what they believed to be a drug ledger in the passenger compartment. A search of the trunk uncovered more cash, a gallon-sized bag of marijuana, and approximately three ounces of methamphetamine wrapped in several packages.

The magistrate judge reasoned that the tips and other information regarding Hulsey's alleged drug activities established probable cause to stop and search her car. Hulsey objected to the report and recommendation, arguing that the background information—the Fedderly ledger and the "numerous reports" from the summer and fall of 1999—were too old to be reliable. She also argued that the background information and the November 28 tip from CI-2 and the November 29 tips from Tonya lacked sufficient indicia of reliability to support a finding of probable cause. The district court, adopting the magistrate judge's factual findings and legal conclusions over Hulsey's objections, denied her suppression motion.

## DISCUSSION

Under the "automobile exception" to the Fourth Amendment's warrant requirement, police officers may stop an automobile without a warrant when they have probable cause or reasonable suspicion to believe that the vehicle contains contraband or evidence of a crime. *Alabama v. White*, 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *see also Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925). A stop based on a traffic violation is reasonable under the Fourth Amendment, regardless of the police officer's subjective motivations for enforcing that particular provi-

sion of the traffic code. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Williams,* 106 F.3d 1362, 1365 (7th Cir. 1997). Here, because Hulsey violated Wisconsin law when her vehicle crossed the center line, *see* Wis. Stat. § 346.05, the stop was reasonable.

■ After the stop, the officers' detection of the odor of alcohol along with Hulsey's admission that she had been drinking justified a search for open containers of alcohol. *United States v. Neumann,* 183 F.3d 753, 756 (8th Cir.1999) (alcohol odor provided probable cause to search vehicle); *cf. United States v. Taylor,* 162 F.3d 12, 21 (1st Cir.1998) (marijuana odor provided probable cause to search car for drugs). Alternatively, the initial search was justified based on Hulsey's consent. The subsequent discovery of the open beer can provided the officers with probable cause to search the entire car. *See* Wis. Stat. § 346.935(2) (possession of open container of alcohol in vehicle on public highway is illegal); *United States v. McGuire,* 957 F.2d 310, 314 (7th Cir.1992) (discovery of open alcohol container in vehicle in violation of state law provided probable cause to believe car contained additional contraband or evidence). Although the search of Hulsey's wallet was arguably outside of the scope of her consent, when the police officers' discovered the open beer can the issue of consent became moot. *See McGuire,* 957 F.2d at 314.

■ At oral argument, however, the government refused to rely on the traffic stop, Hulsey's consent or the discovery of the open beer can as justifications for the stop and search. Accordingly, we proceed to an analysis of probable cause. We review a district court's determination of probable cause de novo and its findings of historical fact for clear error. *Ornelas v.* *United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

■ Due to its fact-sensitive nature there, is no precise test for determining probable cause. *United States v. McClinton,* 135 F.3d 1178, 1183 (7th Cir.1998). Rather, probable cause is said to exist "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas,* 517 U.S. at 696, 116 S.Ct. 1657.

■ The information possessed by the police officers in this case can be grouped into two categories: (1) background information—the Fedderly notebook and the "numerous reports" from the summer and fall of 1999; and (2) the November 28 and 29 tips from CI–2 and Tonya Hulsey. Regarding the first category, we note that the government presented only Sergeant Cragin's conclusions about the majority of the summer and fall 1999 reports. Because such statements do not provide a substantial basis for finding probable cause, we will disregard them. *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Reddrick,* 90 F.3d 1276, 1280 (7th Cir.1996). Thus, this category boils down to the information in the notebook detailing Hulsey's purchase of methamphetamine and marijuana and CI–1's tip that Hulsey regularly sold methamphetamine from the Elk Point Tavern. Hulsey dismisses the notebook as too old to indicate whether she possessed drugs on the night in question and the tip as information from a source of unknown reliability. But just because this information standing alone is insufficient to establish probable cause, does not mean that it is irrelevant to our analysis. Both the notebook and CI–1's tip provided the police with important background information against which they could assess the probable accuracy of the subsequent reports of Hulsey's criminal activities. *See*

*United States v. Williams,* 798 F.2d 1024, 1034 (7th Cir.1986).

Turning to the next category of information, both the November 28 tip from CI–2 and the November 29 tip from the defendant's daughter contained the same detailed information—that Hulsey planned to drive to the Twin Cities on November 29 to pick up methamphetamine and marijuana. The consistency of these tips helps to validate both accounts. *United States v. Schaefer,* 87 F.3d 562, 566 (1st Cir.1996); *see also United States v. Le,* 173 F.3d 1258, 1265 (10th Cir.1999) (collecting cases). Hulsey argues that because both tips originated from unknown secondary sources the police could not be sure that the tips were independent, i.e., it is possible that both tips derived from the same secondary source. Hulsey also reasons that because the police lacked information regarding the secondary sources' basis of knowledge and veracity the tips could not provide probable cause to stop and search her car. But because there were other indications that the information contained in the two tips was accurate, we need not decide whether tips based on information from secondary sources by themselves can establish probable cause. *See Gates,* 462 U.S. at 233, 103 S.Ct. 2317 (reasoning that a deficient showing of an informant's basis of knowledge or veracity may be compensated for by some other indicia of reliability). In this case, Tonya Hulsey's reaction after she learned of her mother's alleged drug dealing indicated that the information contained in her tip was probably true. Unlike most people, she did not immediately reject the possibility that her mother would travel some fifty miles to acquire drugs. Instead, she reported the information to the police and asked them to confiscate the illegal substances. Sergeant Cragin noticed Tonya's obvious distress both when she turned her mother in and when she asked him to keep her participation a secret. Finally, Tonya's descriptions of the kind of drugs her mother intended to pick up and her follow-up tip that Hulsey had just finished packaging the drugs at the Elk Point Tavern were consistent with the background information that identified methamphetamine and marijuana as the types of drugs Hulsey dealt and the tavern as the main location of her drug dealing activities. Thus, we conclude that under the totality of the circumstances—the similarities of the November 28 and 29 tips, Tonya's stated motive for calling the police, her obvious distress over her mother's continued drug use, her wish that the police not reveal her role and the background information—the police were presented with an internally consistent scenario which indicated a fair probability that Hulsey's car contained illegal drugs. *See Massachusetts v. Upton,* 466 U.S. 727, 734, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (per curiam).

Recognizing that one of the government's strongest arguments relies on the fact that her daughter provided the November 29 tips, Hulsey argues that because the police failed to verify the caller's identity they did not know that the informant was Tonya. As the government pointed out at oral argument, however, Tonya twice left her phone number and Sergeant Cragin twice called her back. A caller impersonating another individual in order to supply the police with false information is not likely to provide an accurate phone number where they can be reached. Moreover, Tonya's distress over her mother's continued involvement with drugs was consistent with the background information regarding Hulsey's previous drug dealing. Therefore, it was reasonable for Sergeant Cragin to believe that he was speaking to Hulsey's daughter.

Hulsey also contends that the police failed to independently corroborate either the November 28 or 29 tips. Independent corroboration indicates a tip is reliable

when police officers confirm details suggesting the informant knows inside information about the suspect's activities. *See White*, 496 at 332, 110 S.Ct. 2412; *Gates*, 462 U.S. at 245, 103 S.Ct. 2317. We agree that Sergeant's Cragin's discovery of Hulsey and her car at the Elk Point Tavern confirmed only Hulsey's readily observable location and, thus, did not constitute corroboration of inside information. *See White*, 496 U.S. at 332, 110 S.Ct. 2412. But the lack of independent police corroboration is not fatal to the government's case. As the magistrate judge correctly observed, the question is not whether the police could have done more, it is whether they had enough information to establish probable cause. We conclude that the November 28 and 29 tips, one from a previously reliable informant and one from the defendant's daughter, together with the background information provided probable cause to stop and search Hulsey's car.

Even if we were to determine that the police lacked probable cause in this case, we would still affirm based on our belief that the police officers had a reasonable suspicion that Hulsey had controlled substances in her car. A determination of reasonable suspicion is essentially the same as a probable cause analysis except that, given the relatively minimal intrusion, the required degree of suspicion is not as high. *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). A stop based on reasonable suspicion must be based on "some minimal level of objective justification"; it must be based on more than a "hunch" but it requires less than a "fair probability that contraband or evidence of a crime will be found." *Id.* at 7, 109 S.Ct. 1581 (internal quotations and citations omitted); *see also White*, 496 U.S. at 330, 110 S.Ct. 2412. Here, we are confident that the information available to the police provided reasonable suspicion to stop Hulsey's car. After the stop, Hulsey's consent to search coupled with the discovery of the open container of alcohol justified the search that uncovered the drugs.

## CONCLUSION

We conclude that the police had probable cause to stop and search Hulsey's car. Alternatively, we find the stop justified based on either Hulsey's violation of a state traffic ordinance or the police officers' reasonable suspicion that her car contained controlled substances. Because she consented to a search that uncovered an open container of beer in violation of Wisconsin law, the full search of her car did not violate her rights under the Fourth Amendment.

For the foregoing reasons, the judgement of the district court is AFFIRMED.