Filed 1/12/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>TONY RAMON SIMS,<br><br>     Defendant and Appellant. | D077024<br><br>(Super. Ct. No. SCD281406) |

APPEAL from a judgment of the Superior Court of San Diego County, Jay M. Bloom, Judge.  Affirmed in part, reversed in part, and remanded.

Justin Behravesh, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

Defendant Tony Ramon Sims appeals a judgment of conviction entered after he pleaded guilty to two counts of possession of a firearm by a felon

(Pen. Code, § 29800, subd. (a)(1); counts 1 and 2)[1] and one count of unlawful possession of ammunition (§ 30305, subd. (a)(1)).  He contends the trial court erred in denying a motion to suppress incriminating evidence obtained during a warrantless search of his vehicle.  We conclude the court properly denied the motion to suppress because the search of the defendant's vehicle was valid under the automobile exception to the warrant requirement and, in the alternative, as a search incident to arrest.

The defendant also argues he is entitled to seek a reduction of his three-year probation term under recently-enacted Assembly Bill No. 1950 (Stats. 2020, ch. 328, § 2).  Effective January 1, 2021, Assembly Bill No. 1950 amended section 1203.1 to limit the maximum probation term a trial court is authorized to impose for most felony offenses to two years.  Relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the defendant asserts Assembly Bill No. 1950's limitation on the maximum duration of felony probation terms constitutes an ameliorative change to the criminal law that applies retroactively to cases that were not reduced to final judgment as of the new law's effective date.  We agree.

Therefore, we affirm the judgment in part as to the defendant's conviction, reverse the judgment in part as to the defendant's sentence, and remand the matter for resentencing.

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

II

BACKGROUND

A

*Vehicle Search*

The following facts are drawn from the preliminary hearing.  (See *People v. Turner* (2017) 13 Cal.App.5th 397, 400.)

Shortly before 3:00 a.m., two police officers entered a parking lot in downtown San Diego.  The officers were patrolling the area because the bars in downtown San Diego closed at 2:00 a.m., exiting patrons were often involved in criminal offenses, and the parking lot was known as a place where people went to drink and loiter after they left the bars.  According to one of the officers, there were "people congregat[ing] … [and] partying" in the parking lot, many of whom "scattered" when the officers entered it.

The officers approached a parked vehicle in the parking lot.  The defendant was seated in the front passenger seat and appeared to be passed out.  The keys to the vehicle were in the ignition when the officers approached the vehicle.  The officers engaged the defendant in conversation and detected the odor of alcohol emanating from the defendant.  They observed that the defendant had bloodshot eyes, slurred his speech, fumbled for his wallet, and appeared as though he was going to vomit.  Based on these observations, the officers immediately believed the defendant was intoxicated and in violation of section 85.10 of the San Diego Municipal Code.[2]

At the officers' request, the defendant provided his name.  One officer used his cell phone to search the defendant's name on a criminal records

---

[2]     San Diego Municipal Code section 85.10 states:  "No person who is under the influence of intoxicating liquor or narcotic drugs shall be in or about any motor vehicle, while such vehicle is in or upon any street or other public place."

3

database. The search yielded a record for a person named Tony Sims. The person was on probation and, as a condition of probation, he had executed a Fourth Amendment waiver. The database record included the person's birthdate, height, and weight, as well as a photograph of the person that was approximately one square inch in size when displayed on the officer's cell phone.

The officer asked the defendant whether his birthdate was the birthdate indicated on the database record. The defendant replied, "Yeah." The officer then asked the defendant whether he had been "checking in," apparently to determine whether he was reporting to a probation officer. The defendant replied, "Yeah." Based on these responses and the information contained in the database record, the officer believed the defendant was the Tony Sims whose information was recorded on the database record and, therefore, that the defendant had executed a Fourth Amendment waiver.

The officer asked the defendant to exit the vehicle for a vehicle search. However, the defendant was paralyzed from the waist down. Because the defendant was unable to exit the vehicle without assistance, the officer began to search the vehicle while the defendant remained seated in the front passenger seat. During the ensuing search, the officer recovered a loaded semi-automatic handgun from the rear passenger floorboard. The defendant was then handcuffed and removed from the vehicle, after which the officer continued to search the vehicle. The officer seized a second loaded semi-automatic handgun from underneath the front passenger seat and handgun ammunition from the rear driver side floorboard.

The police later determined the defendant was not the person whose record was produced during the criminal records database search and he had not executed a Fourth Amendment waiver.

4

B

*Procedural Background*

The defendant was charged by information with two counts of possession of a firearm by a felon and one count of unlawful possession of ammunition.

The defendant filed a pretrial motion to suppress all evidence obtained during the search of his vehicle, including the firearms and ammunition. He asserted the warrantless search violated his Fourth Amendment right to be free from unreasonable searches and seizures. The trial court considered and denied the suppression motion at the preliminary hearing. It found the evidence obtained during the search was admissible for three independent reasons: (1) the search was permissible under the automobile exception to the warrant requirement because there was probable cause that evidence of the defendant's public intoxication would be found in the vehicle; (2) the search was permissible as a search incident to arrest; and (3) the evidence was admissible under the good faith exception to the exclusionary rule.[3]

Thereafter, the defendant filed a motion to dismiss the information under section 995, which the trial court denied. The court determined the search of the vehicle was permissible because the officers had probable cause to arrest the defendant and search the vehicle based on the defendant's state of intoxication. It found, in the alternative, the evidence was admissible under the good faith exception to the exclusionary rule.

---

[3]     The court did not expressly reference the automobile exception. However, it opined the defendant was "drunk in public" under section 647, subdivision (f), "or whatever statute [the People] want[ed] to use. So … the[] [police] ha[d] … probable cause to search the vehicle for evidence of that." It is clear to us, and the defendant agrees, that the court relied on the automobile exception as the basis for this ruling.

Over the objection of the prosecutor, the trial court then offered the defendant an indicated sentence of three years of probation. The defendant pleaded guilty to the face of the information and, per the court's indicated sentence, was placed on probation for three years.

III

DISCUSSION

A

*Warrantless Search*

The defendant appeals the judgment on grounds that the warrantless search of his vehicle violated his Fourth Amendment rights. Based on the alleged constitutional violation, the defendant contends the trial court erred in denying his motion to suppress the evidence obtained during the warrantless search of his vehicle.

1

*Legal Principles*

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. (U.S. Const., 4th Amend.) "Warrantless searches are presumed to be unreasonable, therefore illegal, under the Fourth Amendment, subject only to a few carefully delineated exceptions." (*People v. Vasquez* (1983) 138 Cal.App.3d 995, 1000.) As discussed more fully below, two exceptions are relevant for purposes of this appeal—the automobile exception and the exception for searches incident to arrest.

In reviewing a trial court's determination on a motion to suppress evidence, "we rely on the trial court's express and implied factual findings, provided they are supported by substantial evidence, to independently determine whether the search was constitutional. [Citation.] 'Thus, while we ultimately exercise our independent judgment to determine the constitutional

6

propriety of a search or seizure, we do so within the context of historical facts determined by the trial court.' [Citation.] It is the trial court's role to evaluate witness credibility, resolve conflicts in the testimony, weigh the evidence, and draw factual inferences. [Citation.] We review those factual findings under the deferential substantial evidence standard, considering the evidence in the light most favorable to the trial court's order." (*People v. Lee* (2019) 40 Cal.App.5th 853, 860–861 (*Lee*).)

2

*Automobile Exception*

The trial court found the search of the defendant's vehicle was constitutionally permissible under the automobile exception to the warrant requirement. We agree.

Under the automobile exception, " 'police who have probable cause to believe a lawfully stopped vehicle contains evidence of criminal activity or contraband may conduct a warrantless search of any area of the vehicle in which the evidence might be found.' " (*Lee, supra*, 40 Cal.App.5th at p. 862; see *U.S. v. Ross* (1982) 456 U.S. 798, 800 [when police have probable cause, they "may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view"].) The historical rationale for the automobile exception was that the "ready mobility" of a vehicle creates a risk that evidence of a crime or contraband will be lost while a warrant is obtained. (*California v. Carney* (1985) 471 U.S. 386, 391, 391–392; see *Carroll v. United States* (1925) 267 U.S. 132, 153.) Over time, courts have also recognized a second rationale for the automobile exception—a person has a "lesser expectation of privacy" in his or her vehicle due to "the pervasive regulation of vehicles capable of traveling on the public highways." (*Carney*, at pp. 391, 392; see *Cady v. Dombrowski* (1973) 413 U.S. 433, 440–441.)

Probable cause "is a more demanding standard than mere reasonable suspicion.' [Citation.] It exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found….' In determining whether a reasonable officer would have probable cause to search, we consider the totality of the circumstances." (*Lee*, *supra*, 40 Cal.App.5th at p. 862.)

The People argue the officers had probable cause to search the defendant's vehicle because it was reasonable to believe the search would produce evidence the defendant was publicly intoxicated in violation of San Diego Municipal Code section 85.10.[4] We concur. The trial court found the defendant was "drunk in public," a finding that is supported by ample evidence. One officer testified he came to believe the defendant was intoxicated immediately when he encountered the defendant. He based this belief on his personal observations that the defendant had bloodshot eyes, slurred his speech, fumbled with his wallet, seemed as though he was going to vomit, and emitted an odor of alcohol.

Given the defendant's clear state of intoxication, it was reasonable for the officers to believe a search of the vehicle in which the defendant was passed out would produce evidence of alcohol consumption, such as unsealed alcohol containers. (*People v. Molina* (1994) 25 Cal.App.4th 1038, 1042 [officer had probable cause to search vehicle for open containers of alcohol after noticing odor of beer during traffic stop]; see *U.S. v. Hulsey* (7th Cir. 2001) 11 Fed.Appx. 607, 611 [search of motorist's vehicle justified based on

---

4       The People do not address whether there was probable cause to search for evidence of a violation of section 647, subdivision (f), the public intoxication statute. Rather, they argue exclusively that there was probable cause to search for evidence of a violation of the San Diego Municipal Code section 85.10.

8

odor of alcohol and motorist's admission she consumed alcohol]; *U.S. v. Neumann* (8th Cir. 1999) 183 F.3d 753, 755, 756 [officer had probable cause to search vehicle for open container of alcohol where he detected a "faint odor of alcohol" on motorist's breath and motorist appeared nervous].)

The defendant contends the officers lacked probable cause to search his vehicle because his state of intoxication, standing alone, did not give rise to a reasonable inference that he consumed alcohol *in the vehicle* (as opposed to a bar), or that unsealed containers of alcohol would be found *in the vehicle*. Assuming without deciding that "something more" than the defendant's state of intoxication was necessary for the officers to have probable cause for the search, there was "something more" here. The encounter between the officers and the defendant occurred shortly before 3:00 a.m., after nearby bars had closed. At the hearing on the defendant's suppression motion, one of the officers testified the parking lot where the defendant was parked was "a known place to hang out after [bars closed], drink, [and] loiter around." The officer added that there were "people congregat[ing] … around their cars, partying" when the officer and his partner entered the parking lot. These facts, coupled with the defendant's signs of inebriation, provided the officers probable cause to search the vehicle for evidence that the defendant was publicly intoxicated in violation of San Diego Municipal Code section 85.10.

The defendant asserts the officers did not have probable cause to search his vehicle because they already had "enough information" to determine he was publicly intoxicated and "[n]o search of the car was necessary" to determine whether he was in violation of San Diego Municipal Code section 85.10. However, the automobile exception is not so narrow that it applies only when the evidence or contraband believed to be in a vehicle is non-duplicative of other evidence or strictly essential to establish a criminal

9

offense.  Rather, where officers have probable cause that a lawfully-stopped vehicle contains evidence of criminal activity or contraband, such probable cause "alone satisfies the automobile exception to the Fourth Amendment's warrant requirement …." (*Maryland v. Dyson* (1999) 527 U.S. 465, 467.)

For all these reasons, we conclude the police officers had probable cause to search the defendant's vehicle for evidence of his public intoxication. Accordingly, we conclude the search was constitutionally permissible under the automobile exception to the warrant requirement.

3

*Search Incident to Arrest*

As an alternative basis for denying the suppression motion, the trial court determined the search of the defendant's vehicle was permissible as a search incident to the defendant's arrest for public intoxication.  Once again, we agree with the trial court.

Under the so-called *Gant* rule, police may conduct a warrantless search of the passenger compartment of a vehicle and any containers therein, as an incident to a lawful arrest of a recent occupant of the vehicle, so long as "the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." (*Arizona v. Gant* (2009) 556 U.S. 332, 351, italics added (*Gant*).)  The "exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."  (*Id.* at p. 338; see *People v. Macabeo* (2016) 1 Cal.5th 1206, 1214 ["A search incident to arrest 'has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.' "].)  The *Gant* rule

is a "two-part rule" and a warrantless search will be upheld if either prong is satisfied. (*People v. Johnson* (2018) 21 Cal.App.5th 1026, 1035.)

Before we address whether the search satisfied the *Gant* rule, we consider a predicate issue contested by the parties—whether the search was incident to a custodial arrest. We conclude it was. At the hearing on the suppression motion, the arresting officer testified that upon encountering the defendant, he and his partner "were going to place [the defendant] under arrest for [violating section] 85.10 of the municipal code since there[] [was] no one around to take care of him. He[] [was] drunk in public. Couldn't take care of himself." The officer added, "[H]e[] [was] drunk in or around a vehicle. There[] [were] keys in the ignition. He [didn't] have any friends to take care of him. We [couldn't] leave him with somebody else. He[] [was] clearly too intoxicated to help himself, and the keys [were] still there…. So he was being placed under arrest in order to be taken to detox or to jail."

The transcript of the officer's bodyworn camera footage corroborates this testimony. Before the search, the officer instructed the defendant to exit the vehicle. At that point, a bystander asked the officer, "Why is he being detained?" The officer replied, "Because he's drunk in[] and around a vehicle … with no one else around him." The officer's contemporaneous statement that the defendant was being detained due to his state of intoxication, together with the officer's hearing testimony, supports the trial court's

11

implied finding that the officers searched the vehicle incident to a custodial arrest.[5]

The defendant argues the officers did not search his vehicle incident to an arrest; he claims they instead searched it based solely on their mistaken belief that he was on probation and subject to a Fourth Amendment waiver. But the testifying officer refuted this claim during the suppression hearing. According to the officer, he searched the vehicle *both* because he believed (erroneously, as it turns out) that the defendant executed a Fourth Amendment waiver *and* because the defendant was under arrest for public intoxication. After receiving the officer's testimony, the trial court expressly opined the defendant was "drunk in public" and found the search was incident to an arrest. In urging us to reject these findings and disbelieve the testifying officer, the defendant asks us to reweigh the evidence and substitute our findings for those of the trial court. We decline the defendant's invitation, which runs contrary to well-settled principles of appellate review. (*People v. Lieng* (2010) 190 Cal.App.4th 1213, 1218 ["In reviewing the ruling on a motion to suppress, the appellate court defers to the trial court's factual findings, express or implied, when supported by substantial evidence."].)

We further conclude the trial court did not err in reaching its implied finding that the vehicle search satisfied the *Gant* rule. At the time the officers began to search the vehicle—and discovered the first loaded

___

[5]    The fact that the search of the vehicle occurred before the defendant's formal arrest is of no moment, given that the formal "arrest follow[ed] 'quickly on the heels' of the search" and was "supported by probable cause independent of the fruits of the search ...."  (*U.S. v. Smith* (9th Cir. 2004) 389 F.3d 944, 951; see *Rawlings v. Kentucky* (1980) 448 U.S. 98, 111 ["Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."].)

firearm—the defendant was unsecured and seated in the front passenger seat of the vehicle.  The defendant was plainly "within reaching distance of the passenger compartment" while he was unrestrained and seated inside the passenger compartment.  (*Gant, supra*, 556 U.S. at p. 351.)  Therefore, the search—at least the portion of the search conducted while the defendant was seated in the vehicle—was warranted under the first prong of the *Gant* rule.

The defendant asserts it was unreasonable for the arresting officers to believe he might grab something from the vehicle's rear floorboard because he was paralyzed.  However, "*Gant* provides the generalized authority to search the *entire passenger compartment* of a vehicle and any containers therein incident to arrest." (*People v. Nottoli* (2011) 199 Cal.App.4th 531, 555 (*Nottoli*), italics added; see *Thornton v. U.S.* (2004) 541 U.S. 615, 623 ["Once an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment."].)  " '[T]he only question the trial court asks is whether the area searched is generally "reachable without exiting the vehicle, without regard to the likelihood in the particular case that such a reaching was possible." ' " (*U.S. v. Allen* (1st Cir. 2006) 469 F.3d 11, 15, italics omitted; see *United States v. Stegall* (8th Cir. 2017) 850 F.3d 981, 985 ["actual reachability under the circumstances" is irrelevant when considering the scope of a passenger compartment search].)  The backseat of a passenger compartment is generally reachable by an unrestrained person seated in the front of the compartment, irrespective of whether the area was reachable by the defendant in this particular instance.  Accordingly, the search was proper under the first prong of the *Gant* test.

In any event, the entire search of the vehicle—both before and after the defendant was handcuffed and removed from the vehicle—was a valid search

13

incident to arrest under the second prong of the *Gant* test. For the reasons previously discussed in our analysis of the automobile exception, the officers had a reasonable basis to believe the vehicle contained evidence relevant to establish that the defendant was publicly intoxicated in violation of San Diego Municipal Code section 85.10. (See *People v. Quick* (2016) 5 Cal.App.5th 1006, 1012–1013 [" '[W]hen a driver is arrested for driving under the influence, or being under the influence, it will generally be reasonable for an officer to believe evidence related to that crime might be found in the vehicle.' "], quoting *People v. Evans* (2011) 200 Cal.App.4th 735, 750; *Nottoli, supra,* 199 Cal.App.4th at p. 553 [defendant's "arrest for 'being under the influence of a controlled substance' supplied a reasonable basis for believing that evidence 'relevant' to that type of offense might be in his vehicle."].) For that independent reason, we conclude the search was a valid search incident to arrest.[6]

B

*Assembly Bill No. 1950*

At the time the defendant was sentenced, section 1203.1, subdivision (a) provided that a court may impose felony probation "for a period of time not exceeding the maximum possible term of the sentence." It further provided that "where the maximum possible term of the sentence is five years or less, then the period of suspension of imposition or execution of sentence may, in the discretion of the court, continue for not over five years." (Former § 1203.1, subd. (a).)

---

[6] Because the search of the vehicle was constitutionally permissible under the automobile exception and as a search incident to arrest, we do not consider whether the trial court properly denied the suppression motion under the good faith exception to the exclusionary rule.

During the pendency of this appeal, the Legislature enacted Assembly Bill No. 1950, which amended section 1203.1. (Stats. 2020, ch. 328, § 2.) Subject to exceptions not applicable here, section 1203.1, subdivision (a), as amended, provides that a felony probation term cannot exceed two years.[7]

The defendant contends Assembly Bill No. 1950's two-year limitation for felony probation terms applies retroactively to cases like his own that were not final when the new law became effective on January 1, 2021. In support of this argument, the defendant relies on the presumption of retroactivity articulated in *Estrada*, *supra*, 63 Cal.2d 740. As we will explain, we agree with the defendant that Assembly Bill No. 1950's two-year felony probation limitation applies retroactively.

1

*The* Estrada *Presumption*

By default, criminal statutes are presumed to apply prospectively only. (§ 3 ["No part of [the Penal Code] is retroactive, unless expressly so declared."]; see *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307 (*Lara*).) "However, this presumption is a canon of statutory interpretation rather than a constitutional mandate. [Citation.] Accordingly, 'the Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication.' " (*People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*).) To determine whether a law is meant to apply retroactively, the role of a court is to determine the intent of the Legislature. (*Ibid.*)

In *Estrada*, *supra*, 63 Cal.2d 740, the Supreme Court set forth an important qualification to the default presumption against retroactivity. The

---

7    Assembly Bill No. 1950 also amended section 1203a to limit the maximum length of a misdemeanor probation term for most misdemeanor offenses to one year. (Stats. 2020, ch. 328, § 1.)

15

*Estrada* Court recognized that when the Legislature enacts a new law ameliorating a criminal penalty, it determines "that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act." (*Id.* at p. 745.) The *Estrada* Court determined that in the absence of an express savings clause or other indication of prospective-only application, courts must infer the Legislature intended its new ameliorative law to apply "to every case to which it constitutionally could apply," including cases in which the criminal acts were committed before the law's passage provided the defendant's judgment is not final. (*Ibid.*) To hold otherwise, the *Estrada* Court reasoned, "would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Ibid.*)

The ameliorative law at issue in *Estrada* was a law that reduced the penalties applicable to a particular criminal offense. (*Estrada*, *supra*, 63 Cal.2d at pp. 743–744.) However, the *Estrada* presumption of retroactivity has been applied in numerous other contexts since it was first articulated. For instance, the Supreme Court has applied the *Estrada* presumption to statutes governing penalty enhancements and substantive offenses. (*Frahs*, *supra*, 9 Cal.5th at p. 628 [collecting cases].) Further, and pertinent to this appeal, it has applied the *Estrada* presumption "to statutes that merely made a reduced punishment *possible*." (*Id.* at p. 629 [collecting cases].)

*People v. Francis* (1969) 71 Cal.2d 66 was an early case in which the Supreme Court applied the *Estrada* presumption to a law that merely made reduced punishment possible. In that case, the Legislature modified the punishment for possession of marijuana, which had been a straight felony, to permit it to be treated as a misdemeanor. (*Id.* at p. 70.) The People argued the amendment did not reflect a "legislative determination that the 'former

16

penalty was too severe,' " and thus did not apply retroactively, because it afforded courts "discretion to impose either the same penalty as under the former law or a lesser penalty." (*Id.* at p. 76.)  The Supreme Court rejected this argument and applied the *Estrada* presumption.  (*Ibid.*)  Although the new law did not guarantee a lighter sentence for defendants, the presumption of retroactivity applied because the new law reflected a legislative determination that "the former penalty provisions may have been too severe *in some cases* …." (*Id.* at p. 76, italics added.)

The Supreme Court employed similar reasoning in *Lara*, *supra*, 4 Cal.5th 299.  In that case, the Supreme Court was asked to decide whether to give retroactive application to a provision of Proposition 57 that eliminated prosecutors' unilateral authority to charge a juvenile offender directly in adult court and instead required prosecutors to obtain a juvenile court's approval before trying a juvenile offender in adult court.  (*Id.* at pp. 305–306.)  Proposition 57 was "different from the statutory changes in *Estrada*" because it "did not ameliorate the punishment, or possible punishment, for a particular crime; rather, it ameliorated the possible punishment for a class of persons, namely juveniles." (*Id.* at p. 308.)  Nonetheless, the Court held that the *Estrada* presumption applied.  According to the Supreme Court, the fact that Proposition 57 had a potential ameliorating benefit in some cases for some juvenile offenders warranted retroactive application.  (*Id.* at p. 309.)

Just last year, the Supreme Court applied the *Estrada* presumption of retroactivity to another law that merely made reduced punishment possible, in *Frahs*, *supra*, 9 Cal.5th 618.  The law at issue in *Frahs* was a statute establishing a pretrial diversion program for certain defendants with mental health disorders.  (*Id.* at pp. 626–627.)  Under the pretrial diversion statute, defendants who were granted diversion were referred to a mental health

17

treatment program and entitled to a possible dismissal of their criminal charges. (*Id.* at pp. 626–627.) Because a court's decision to grant diversion could result in a defendant receiving mental health treatment, avoiding criminal prosecution, and maintaining a clean criminal record, as opposed to suffering a prison sentence, the pretrial diversion statute "offer[ed] a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer[ed] from a qualifying mental disorder." (*Id.* at p. 631.) Based on the pretrial diversion statute's ameliorative nature, the Supreme Court determined the statute fell "squarely within the spirit of the *Estrada* rule," and was therefore entitled to retroactive application. (*Ibid.*)

With these principles in mind, we turn to whether Assembly Bill No. 1950's two-year limitation on felony probation operates retroactively.

2

*Application*

The People assert Assembly Bill No. 1950's felony probation limitation is not subject to the *Estrada* presumption of retroactivity. They contend the *Estrada* presumption applies only to criminal laws that reduce punishment and, according to the People, probation is not punishment.

The People are correct that "[a] grant of probation is 'qualitatively different from such traditional forms of punishment as fines or imprisonment.'" (*People v. Moran* (2016) 1 Cal.5th 398, 402.) Probation is primarily rehabilitative and a grant of probation is considered an act of grace or clemency in lieu of traditional forms of punishment. (*Ibid.*; but see *People v. Edwards* (1976) 18 Cal.3d 796, 801 [probation is "an alternative form of punishment in those cases when it can be used as a correctional tool"]; *Fetters v. County of Los Angeles* (2016) 243 Cal.App.4th 825, 837 ["Both California and federal courts … regard probation as a 'form of punishment'"]; *People v.*

18

*Delgado* (2006) 140 Cal.App.4th 1157, 1170 [retroactive application of statute mandating imposition of certain probation conditions violated ex post facto principles because it "impose[d] greater punishment in probation cases"].)

However, we do not believe the label affixed to probation—i.e., whether it is labeled punishment, rehabilitation, or some combination—is necessarily determinative of whether the *Estrada* presumption of retroactivity applies. When a court places a defendant on probation, it may, of course, fine the defendant or order the defendant confined in jail, or both. (§ 1203.1, subd. (a).) But it has discretion to impose a variety of other probation conditions as well. It may, for example, require that the probationer submit to searches of electronic devices and social media accounts (*People v. Ebertowski* (2014) 228 Cal.App.4th 1170), submit to periodic drug testing (Health & Saf. Code, § 11551), refrain from associating with persons or groups of persons (*People v. Mendez* (2013) 221 Cal.App.4th 1167), and obtain permission from a probation officer before changing addresses or leaving the state or county (*People v. Matranga* (1969) 275 Cal.App.2d 328; see *People v. Relkin* (2016) 6 Cal.App.5th 1188). A probationer may even be required to wear a continuous electronic monitoring device that alerts a probation officer to the probationer's whereabouts at all times (§ 1210.7 et seq.).

As these illustrative examples make clear, probation—though often deemed preferable to imprisonment from the perspective of a defendant—can be invasive, time-consuming, and restrictive for a probationer.[8] A probationer "is in constructive custody—he is under restraint." (*People v. Crus-Lopez* (2018) 27 Cal.App.5th 212, 221; see *People v. Cisneros* (1986) 179

_____

[8]    If a defendant does not believe probation is preferable, "he or she may refuse probation and choose to serve the sentence." (*People v. Olguin* (2008) 45 Cal.4th 375, 379.)

19

Cal.App.3d 117, 120 [a probationer is in "constructive incarceration"].)  Thus, "[w]hile probation is not technically a 'punishment,' being ' "rehabilitative in nature" ' [Citation], there is no question it is a sanction that imposes significant restrictions on the civil liberties of a defendant." (*People v. Davis* (2016) 246 Cal.App.4th 127, 140, fn. 6; see *Hicks on Behalf of Feiock v. Feiock* (1988) 485 U.S. 624, 639, fn. 11 ["A determinate term of probation puts the contemnor under numerous disabilities that he cannot escape"].)  By limiting the maximum duration a probationer can be subject to such restraint, Assembly Bill No. 1950 has a direct and significant ameliorative benefit for at least some probationers who otherwise would be subject to additional months or years of potentially onerous and intrusive probation conditions.

Further, a trial court possesses broad discretion to revoke probation "if the interests of justice so require and the court, in its judgment, has reason to believe … the person has violated any of the conditions of their supervision …."  (§ 1203.2, subd. (a).)  A probation violation need not be proven beyond a reasonable doubt or by clear or convincing evidence; a mere preponderance of the evidence is sufficient to support a finding that a probation condition has been violated.  (*People v. Rodriguez* (1990) 51 Cal.3d 437, 441.)  Upon a finding that a probation condition has been violated, courts can—and routinely do—sentence noncompliant probationers to prison to serve out their sentences.  (§ 1203.2, subd. (c); see Feinstein, *Reforming Adult Felony Probation to Ease Prison Overcrowding:  An Overview of California S.B. 678* (2011) 14 Chapman L.Rev. 375, 380–381 ["A probationer 'fails' probation when he has his probation status revoked due to a technical violation, like failing a drug test, or he is convicted for a new crime.  Of those who fail each year, a significant portion–somewhere from 14,532 to an upward estimate of 20,000–winds up in state prison."], footnotes omitted.)

20

There is no dispute that the longer a probationer remains on probation, the more likely it is he or she will be found to be in violation of a probation condition. There also is no dispute that the longer a probationer remains on probation, the more likely it is he or she will be sentenced to prison for a probation violation. Assembly Bill No. 1950 does not guarantee that a probationer will abide by his or her probation conditions and, as a result, avoid imprisonment. However, by limiting the duration of felony probation terms, Assembly Bill No. 1950 ensures that at least some probationers who otherwise would have been imprisoned for probation violations will remain violation-free and avoid incarceration. Like the laws at issue in *Lara* and *Frahs*, Assembly Bill No. 1950 thus ameliorates possible punishment for a class of persons—felony probationers. In the absence of a contrary indication, we must apply the *Estrada* presumption and presume the Legislature intended its " 'ameliorative change[] to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 881, quoting *People v. Conley* (2016) 63 Cal.4th 646, 657 (*Conley*).)

Our conclusion is consistent with *People v. Burton* (2020) 58 Cal.App.5th Supp. 1, a recent decision from the Appellate Division of the Los Angeles Superior Court giving retroactive application to Assembly Bill No. 1950's one-year limitation on misdemeanor probation terms. The *Burton* court found that "[t]he longer the length of probation, the greater the encroachment on a probationer's interest in living free from government intrusion." (*Id.* at p. 15.) It also found that "[t]he longer a person is on probation, the potential for the person to be incarcerated due to a violation increases accordingly." (*Ibid.*) For both reasons, the court determined the one-year limitation for misdemeanor probation was an ameliorative change

21

for purposes of *Estrada*. (*Id.* at p. 16.) Although the *Burton* decision concerned the retroactivity of the law's one-year limitation on misdemeanor probation terms, its logic applies equally to the law's two-year limitation on felony probation terms. The *Burton* decision, while not binding on us, bolsters our conclusion that the *Estrada* presumption of retroactivity applies to the felony probation limitation contained in Assembly Bill No. 1950.

Our conclusion finds further support in *People v. Quinn* (Jan. 11, 2021, A156932) __ Cal.App.5th __ [2021 Cal.App.Lexis 27] (*Quinn*), an opinion issued the same day oral argument took place in this case. In *Quinn*, our colleagues in Division Four of the First District Court of Appeal concluded, as we do here, that the *Estrada* presumption of retroactivity applies to the two-year felony probation limitation in Assembly Bill No. 1950. (*Id.* at pp. *3–12.) The *Quinn* decision cited extensively from the *Burton* decision and noted that its reasoning was "persuasive." (*Id.* at pp. *9–11.) We agree.[9]

Although we have determined that Assembly Bill No. 1950's limitation on felony probation terms is an ameliorative change under *Estrada*, that fact alone does not dictate whether the law applies retroactively. "Because the *Estrada* rule reflects a presumption about legislative intent, rather than a constitutional command, the Legislature … may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal-law amendments if it so chooses." (*Conley*, *supra*, 63 Cal.4th at p. 656.) If the Legislature wishes to do so, it must "clearly signal[] its intent to make the

---

[9] The *Quinn* court added that even if the *Estrada* presumption of retroactivity does not apply to the two-year felony probation limitation in Assembly Bill No. 1950, it is very clear from extrinsic sources that the Legislature intended the two-year felony probation limitation to apply retroactively. (*Quinn*, *supra*, at pp. *11–13.) Given our determination that the *Estrada* presumption of retroactivity applies, we do not reach this issue.

22

amendment prospective, by the inclusion of either an express saving clause or its equivalent." (*People v. Nasalga* (1996) 12 Cal.4th 784, 793.)

Assembly Bill No. 1950 does not contain a savings clause evincing a clear intent to overcome the *Estrada* presumption of retroactivity. "Nor do we perceive in the legislative history a clear indication that the Legislature did not intend for the statute to apply retroactively." (*Frahs*, *supra*, 9 Cal.5th at p. 635.) On the contrary, the legislative history for Assembly Bill No. 1950 suggests the Legislature harbored strong concerns that probationers— including probationers whose cases are pending on appeal—face unwarranted risks of incarceration due to the lengths of their probation terms.

For instance, the Assembly and Senate Committees on Public Safety quoted the following statement from Assembly Bill No. 1950's author in their bill reports: " '[A] large portion of people violate probation and end up incarcerated as a result…. 20 percent of prison admissions in California are the result of supervised probation violations, accounting for the estimated $2 billion spent annually by the state to incarcerate people for supervision violations. Eight percent of people incarcerated in a California prison are behind bars for supervised probation violations. Most violations are "technical" and minor in nature, such as missing a drug rehab appointment or socializing with a friend who has a criminal record. [¶] "Probation - originally meant to reduce recidivism–has instead become a pipeline for reentry into the carceral system…. A shorter term of probation, allowing for an increased emphasis on services, should lead to improved outcomes for both people on misdemeanor and felony probation while reducing the number of people on probation returning to incarceration." (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 1950 (2019–2020 Reg. Sess.) as amended May 6, 2020 (hereafter, Assembly Public Safety Report), p. 3; Sen. Com. on

23

Public Safety, Rep. on Assem. Bill No. 1950 (2019–2020 Reg. Sess.), as amended June 10, 2020, p. 4 (hereafter, Senate Public Safety Report); see also Assem. Com. on Appropriations, Rep. on Assem. Bill No. 1950 (2019–2020 Reg. Sess.) as amended May 21, 2020, p. 1 [defendants "on probation for extended periods of time are less likely to be successful because even minor or technical violations of the law may result in a violation of probation"].)

The Assembly Public Safety Report went on to cite a publication suggesting " 'probation can actually increase the probability of future incarceration—a phenomenon labeled "back-end net-widening[.]" ' " (Assem. Public Safety Rep., *supra*, at p. 5.) It added that some scholars believe " 'enhanced restrictions and monitoring of probation set probationers up to fail, with mandatory meetings, home visits, regular drug testing, and program compliance incompatible with the instability of probationers' everyday lives. In addition, the enhanced monitoring by probation officers (and in some cases, law enforcement as well) makes the detection of minor violations and offenses more likely.' " (*Ibid*.) According to the Assembly Public Safety Report, "[i]f the fact that an individual is on probation can increase the likelihood that they will be taken back into custody for a probation violation that does not necessarily involve new criminal conduct, then shortening the period of supervision is a potential avenue to decrease individuals' involvement in the criminal justice system for minor infractions." (*Ibid*.)

While these legislative materials do not speak directly to the issue of retroactivity, they suggest the Legislature viewed Assembly Bill No. 1950 as an ameliorative change to the criminal law that would ensure that many probationers avoid imprisonment. Presumably, the Legislature was aware such ameliorative changes apply retroactively under the *Estrada*

24

presumption.  (See *People v. Carrasco* (1981) 118 Cal.App.3d 936, 945 ["A cardinal principle of statutory construction is that the Legislature is presumed to be aware of existing judicial practices and interpretations when it enacts a statute."].)  There is no indication in the law's text or legislative materials that the Legislature intended to alter the default *Estrada* presumption.  This omission suggests the Legislature had no such intent.

The People do not identify any statutory language or legislative history supporting their claim that Assembly Bill No. 1950 applies prospectively only.  Instead, they argue that a retroactive application of the law would unjustly deprive some existing probationers of helpful rehabilitative services they would otherwise receive if they were permitted to complete their existing probation terms.  This policy argument sheds no light on whether the Legislature evinced a clear intent to overcome the *Estrada* presumption of retroactivity.  In any event, Assembly Bill No. 1950's legislative history undercuts the People's policy argument concerning the extent to which probationers would benefit from more than two years of probation services.  For instance, the Assembly Public Safety Report states "that probation services, such as mental healthcare and addiction treatment, are most effective during the first 18 months of supervision," and concluded "[a] two year period of supervision would likely provide a length of time that would be sufficient for a probationer to complete any counseling or treatment that is directed by a sentencing court."  (Assem. Public Safety Rep., *supra*, at p. 6; see Sen. Public Safety Rep., *supra*, at p. 6 ["The purpose of the bill is to end wasteful spending[] [and] to focus limited rehabilitative and supervisory resources on persons in their first 12 to 24 months on probation…."]; *Quinn*, *supra*, at pp. *15–16 ["the amendment of Assembly Bill No. 1950 reflects a

25

categorical determination that a shorter term of probation is sufficient for the purpose of rehabilitation"].)

The People assert retroactive application of Assembly Bill No. 1950 may harm some current probationers in another way—by preventing them from successfully completing their existing probation conditions in a timely manner. This is another policy argument that has little, if any, relevance to whether the two-year limitation applies retroactively. Regardless, the logistical problems associated with a two-year probation limitation "do not provide a sufficient basis to deny defendants the benefit of [the two-year limitation] altogether." (*Frahs, supra*, 9 Cal.5th at p. 636; accord *Quinn, supra*, at p. *16 ["There is no indication in the legislative history [of Assembly Bill No. 1950] that the Legislature was concerned with disruptions to probationary proceedings already in progress."].) We are confident that to the extent current probationers face difficulties timely completing their probation conditions through no fault of their own, those conditions can be modified as needed to account for the two-year felony probation limitation our Legislature has imposed. (§ 1203.3, subd. (a); see *People v. Killion* (2018) 24 Cal.App.5th 337, 340 ["Generally, a trial court has the authority and discretion to modify a probation term during the probationary period, including the power to terminate probation early."].)

For all these reasons, we conclude the two-year limitation on felony probation set forth in Assembly Bill No. 1950 is an ameliorative change to the criminal law that is subject to the *Estrada* presumption of retroactivity. The Legislature did not include a savings clause or other clear indication that the two-year limitation applies on a prospective-only basis. Therefore, we conclude the two-year limitation applies retroactively to all cases not reduced to final judgment as of the new law's effective date. Here, the defendant's

26

case was pending on direct appeal and thus was not final as of Assembly Bill No. 1950's effective date.  Accordingly, the defendant is entitled to seek a reduced probation term on remand under Assembly Bill No. 1950.

## IV

## DISPOSITION

The judgment is affirmed in part as to the defendant's conviction and reversed in part as to the defendant's sentence.  The matter is remanded for resentencing consistent with this opinion.

McCONNELL, P. J.

WE CONCUR:


BENKE, J.


AARON, J.